**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                    :
CEDAR & WASHINGTON ASSOCIATES, LLC,                 :
                                                    :   21 MC 101 (AKH)
                                Plaintiff,          :   This Document Relates to:
                                                    :   08 CV 9146 (AKH)
                -against-                            :
                                                    :   ECF Case
THE PORT AUTHORITY OF NEW YORK                      :
AND NEW JERSEY, et al.,                             :
                                                    :
                                Defendants.         :
                                                    :
-------------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**SUBMISSIONS ON THE ACT OF WAR DEFENSE**

Cohen Tauber Spievack & Wagner P.C.
420 Lexington Avenue, Suite 2400
New York, NY 10170
Tel. 212-586-5800
Fax 212-586-5095

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.   THE 9/11 TERRORIST ATTACKS DO NOT CONSTITUTE  AN ACT OF
     WAR WITHIN THE MEANING OF CERCLA ................................................................ 3

   A.   CERCLA's Statutory Scheme ................................................................................ 3

   B.   CERCLA's Legislative History ............................................................................. 5

   C.   CERCLA 107(b)'s Affirmative Defenses Are Narrowly Construed ........................... 7

   D.   The Weight of Non-CERCLA Authority Indicates that Acts of Terrorism are
        Not Acts of War ................................................................................................. 11

        1.   The Anti-Terrorism Act (the "ATA") ............................................................. 11

        2.   Acts of Terrorism Under Insurance Law ......................................................... 13

II.  ON THIS RULE 12(C) MOTION, DEFENDANTS CANNOT RELY ON PURPORTED
     FACTS OUTSIDE THE PLEADING TO ESTABLISH THAT THE TERRORIST
     ATTACK WAS AN ACT OF WAR ............................................................................ 15

III. DEFENDANTS CANNOT ESTABLISH ON A RULE 12(c) MOTION THAT THE
     9/11 TERRORIST ATTACKS WERE THE SOLE CAUSE OF THE RELEASE ...... 21

IV.  A JUDICIAL DETERMINATION THAT A TERRORIST ACT CAN BE AN "ACT
     OF WAR" HAS FAR REACHING AND UNACCEPTABLE CONSEQUENCES .... 24

   A.   Terror Victims May No Longer Be Able To Seek Damages Under The ATA .......... 25

   B.   Al Qaeda Terrorists Could Be Entitled To The Rights of Soldiers Under U.S.
        Military Protocol And The Geneva Conventions ....................................................... 27

CONCLUSION ..................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aegis Ins. Services, Inc. v. 7 World Trade Co., L.P.*,
   11-4403-CV (2d Cir.)..................................................................................................22

*B.F. Goodrich Co. v. Murtha*,
   958 F.2d 1192 (2d Cir. 1992)..................................................................................4, 14

*Biton v. Palestinian Interim Self-Government Auth.*,
   412 F. Supp. 2d 1 (D.D.C. 2005) ..........................................................................11, 26

*Boim v. Quranic Literacy Inst.*,
   291 F.3d 1000 (7th Cir. 2002) ......................................................................................26

*Coeur D'Alene Tribe v. Asarco Inc.*,
   No. CV 91-0342NEJL, 0122NEJL, 2001 WL 34139603 (D. Idaho Mar. 30, 2001) ...............9

*Delson v. Minogue*,
   190 F. Supp. 935 (E.D.N.Y. 1961) ...............................................................................22

*Estate of Klieman v. Palestinian Auth.*,
   424 F. Supp. 2d 153 (D.D.C. 2006) ........................................................................12, 26

*Estates of Ungar ex. Rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d. 232 (D.R.I.
   2004) ..........................................................................................................................11

*Freeman v. Glaxo Wellcome Inc.*,
   189 F.3d 160 (2d Cir. 1999)..........................................................................................24

*Gen. Elec. v. AAMCO Transmissions, Inc.*,
   962 F.2d 281 (2d Cir. 1992)............................................................................................3

*Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist
   Congregational Church*,
   887 F. 2d. 228 (9th Cir. 1989) .....................................................................................23

*Global Network Commc'ns, Inc. v. City of New York*,
   458 F.3d 150 (2d Cir. 2006)..........................................................................................15

*Hamdan v. Rumsfeld*,
   548 U.S. 547 (2006)................................................................................................20, 21

*Hamdi v. Rumsfeld*,
   542 U.S. 507, 520-21 (2004) ........................................................................................28

*Holiday Inns Inc. v. Aetna Ins. Co.*,
   571 F. Supp. 1460 (S.D.N.Y. 1983)............................................................................14

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA)*
   *Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010), *reconsideration denied* 09 MD 2058 PKC,
   2010 WL 4237304 (S.D.N.Y. Oct. 8, 2010) ..............................................................16

*In re Sept. 11 Litig.*,
   No. 10-4197-cv, at 5 (2d Cir. May 23, 2012) .............................................................1

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
   146 F.3d 66 (2d Cir. 1998).........................................................................................15

*Irish Lesbian & Gay Org. v. Giuliani*,
   143 F.3d 638 (2d Cir. 1998).......................................................................................15

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950)...................................................................................................28

*Lincoln Props., Ltd. v. Higgins*,
   823 F. Supp. 1528 (E.D. Cal. 1992)............................................................................5

*Morris v. Khadr*,
   415 F. Supp. 2d 1323 (D. Utah 2006)................................................................. passim

*New York v. Shore Realty Corp.*,
   759 F.2d 1032 (2d Cir. 1985)......................................................................................4

*New York v. Solvent Chemical Co.*,
   225 F. Supp. 2d 270 (W.D.N.Y. 2002) .......................................................................4

*Padilla ex rel. Newman v. Bush*,
   233 F. Supp. 2d 564 (S.D.N.Y. 2002)........................................................................27

*Padilla v. Hanft*,
   432 F.3d 582 (4th Cir. 2005) .....................................................................................21

*Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*,
   505 F.2d 989 (2d Cir. 1974).........................................................................13, 14, 17

*Pinhole Point Props., Inc. v. Bethlehem Steel Corp.*,
   596 F. Supp. 283 (N.D. Cal. 1984) .............................................................................8

*R.E. Goodson Construction Co. v. Int'l Paper Co.*,
   No. C/A 4:02-4184-RBH, 2005 WL 2614927 (D.S.C. Oct. 13, 2005).......................9

*Sellers v. M.C. Floor Crafters, Inc.*,
    842 F.2d 639 (2d Cir. 1988)................................................................15

*Smith v. Socialist People's Libyan Arab Jamahiriya*,
    101 F.3d 239 (2d Cir. 1996).............................................................30

*Sokolow v. Palestine Liberation Org.*,
    583 F. Supp. 2d 451 (S.D.N.Y. 2008).........................................13, 26

*U.S. v. Farhane*,
    634 F.3d 127 (2d Cir. 2011)..............................................................21

*United States v. A & N Cleaners & Launderers, Inc.*,
    854 F. Supp. 229 (S.D.N.Y. 1994)...................................................21

*United States. v. Alcan Aluminum Corp.*,
    964 F.2d 252 (3d Cir. 1992)................................................................4

*United States v. E.I. du Pont de Nemours & Co., Inc.*,
    341 F. Supp. 2d 215 (W.D.N.Y. 2004) ...............................................4

*United States v. Fleet Factors Corp.*,
    819 F. Supp. 1079 (S.D. Ga. 1993).....................................................4

*United States v. Khadr*,
    717 F. Supp. 2d 1215 (Ct. Mil. Comm'n Rev. 2007) .........................28

*United States v. Lindh*,
    212 F. Supp. 2d 541 (E.D. Va. 2002) ................................................27

*United States v. Pineda*,
    No. CR. 04-232, 2006 WL 785287 (D.D.C. Mar. 28, 2006)................27

*United States v. Shell Oil Co.*,
    841 F. Supp. 962 (C.D. Cal. 1993) ..................................................8, 9

*United States v. Shell Oil*,
    294 F. 3d 1045 (9th Cir. 2002) ......................................................24

*United States v Sterling Centrecorp Inc.*,
    No. 2:08-CV-02556-MCE, 2011 WL 6749801 (E.D. Cal. Dec. 22, 2011) .............................8

*Weiss v. Arab Bank, PLC*,
    No. 06 CV 1623, 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007)................11, 12, 26

*Westfarm Assocs. Ltd. P'ship v. Washington Suburban Sanitary Comm'n*,
    66 F.3d 669 (4th Cir 1995) .................................................................3

**STATUTES**

18 U.S.C. § 2331. ...................................................................................................................11

18 U.S.C. § 2336(a) .........................................................................................................11, 25

42 U.S.C. 9607(b)(2) ...............................................................................................................23

42 U.S.C. § 9607(a) ...................................................................................................................3

42 U.S.C. § 9607(a), (b). .............................................................................................................3

42 U.S.C. § 9607 (b) ................................................................................................................21

Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, § 101(35),
    100 Stat. 1613 (1986) (codified at 42 U.S.C. § 9601) ............................................................7

**OTHER AUTHORITIES**

2 The Law of Hazardous Waste: Management, Cleanup, Liability Litigation § 14.01[8][b]
    at 14–160.3 (Susan M. Cooke, ed.)..........................................................................................9

4 William H. Rodgers, Jr., Environmental Law: Hazardous wastes and substances § 8:13
    (C)(3)(c) (1992) ....................................................................................................................10

126 Cong. Rec. S10846 (daily ed. Aug. 5, 1980) ............................................................................6

Army Field Manual 27-10 ........................................................................................................27

Curtis A. Bradley and Jack L. Goldsmith, *Congressional Authorization and the War on
    Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005)....................................................................19

Fed. R. Civ. P. 12(b)(6)...........................................................................................................15

Fed. R. Evid. 201 ...................................................................................................................15

Fed. R. Evid. 201(b).................................................................................................................15

Fed R. Civ. P. 12(c) ......................................................................................................... passim

H.R. 2817 ...............................................................................................................................7

H.R. 2817, 99th Cong. § 504 (1st Sess. 1985).............................................................................7

H.R. Rep. 102-1040 (1992).........................................................................................................26

H.R. Rep. 99-962 (1986)............................................................................................................8

Insurance Journal (Sept. 20, 2001), *available at*
    http://www.insurancejournal.com/news/national/2001/09/20/14323.htm ............................ 18

Oil Pollution Liability: Hearings on H.R. 9294, H.R. 10969, H.R. 10363, and H.R. 10756
    Before the Subcomm. on Coast Guard and Navigation of the H. Comm. on Merchant
    Marine and Fisheries, 94th Cong. 1st and 2nd Sess. 344 (1976) ............................................ 6

Antonio J. Rodrigez, *When Your Ship Is in the Bull's Eye: The Maritime Transportation
    Security Act and Potential Vessel Owner Liability to Third Parties Resulting from A
    Terrorist Attack*, 17 U.S.F. Mar. L.J. 241, 283 (2005) ........................................................... 14

# INTRODUCTION

The Second Circuit issued a mandate remanding this case to this Court "for the limited purpose of allowing it to decide in the first instance whether the act-of-war exception in CERCLA, considered in the context of CERCLA's statutory scheme and the intent of Congress, applies in this case."  *In re Sept. 11 Litig.*, No. 10-4197-cv, at 5 (2d Cir. May 23, 2012) (summary order).  For the following reasons, as explained more fully below, this Court cannot find that the terrorist attacks on the World Trade Center on September 11, 2001, constituted an act of war for CERCLA purposes.

*First*, CERCLA jurisprudence and the legislative history show that Congress intended CERCLA liability to be broadly construed.  Courts considering the act of war defense in the CERCLA context have defined it as requiring an act of a state, which would necessarily exclude attacks by the non-military, non-sovereign al Qaeda.  Moreover, CERCLA legislative history demonstrates that Congress was aware of the threat of contamination due to terrorism, and nevertheless opted not to include language in the statute that would carve out an exception for acts of terrorism. The legislative history also demonstrates that Congress distinguished acts of terrorism from acts of war.

*Second*, other areas of law dealing with act of war exclusions show that an act of terrorism is not an act of war. Given CERCLA's remedial purpose and statutory scheme requiring broad liability and very narrow defenses, the same is true here.

*Third*, certain of the Defendants improperly rely on selective rhetoric outside the four corners of the pleading to support their contention that the September 11 terrorist attacks constituted an act of war.  Not only are these materials contradicted by myriad other materials, and thus at best raise a disputed issue of fact that cannot be decided on a Rule 12(c) motion, they

also are largely irrelevant in the CERCLA context.  Indeed, this Court need look no further than Defendants' opening briefs to determine that there are issues of fact in dispute.  Some of the Defendants (the two Aviation Defendants, Host, and Westfield[1]) advocate that the 9/11 terrorist attacks were acts of war (although notably did not move to dismiss on those grounds in their respective initial Rule 12(c) motions).   Con Edison[2] contends that the issue of whether CERCLA's act of war defense applies is premature and thus declines to take a position.  Similarly, Port Authority[3] does not take a position on whether the act of war defense applies.  WTCP[4] is at the other end of the spectrum and argues (correctly) that the 9/11 terrorist attacks were *not* acts of war and that a determination of whether they were the "sole cause" of the release of hazardous substances is a factual issue that may not be decided on a rule 12(c) motion.

*Fourth*, a judicial determination that the 9/11 terrorist attacks constitute acts of war based on non-CERCLA materials will have far-reaching and unacceptable ramifications beyond the CERCLA context.  This Court cannot limit the application of its ruling to CERCLA while relying on non-CERCLA related materials.

For these reasons, as more fully set forth below, this Court should rule that the events of 9/11 are not subject to CERCLA's act of war CERCLA exception.

---

[1]      The "Aviation Defendants" includes American Airlines, Inc. and AMR Corporation ("American"), United Airlines Inc., and United Continental Holdings, Inc. f/k/a UAL Corporation ("United").  "Host" means HMH WTC LLC and Host Hotels and Resorts Inc. "Westfield" means Westfield WTC LLC and Westfield Corporation, Inc.

[2]      "Con Edison" means the Consolidated Edison Company of New York, Inc.

[3]      "Port Authority" means the Port Authority of New York and New Jersey.

[4]      "WTCP" means Silverstein Properties, Inc., World Trade Center Properties LLC, Silverstein WTC Mgmt. Co. LLC, 1 World Trade Center LLC, Two World Trade Center LLC, and Four World Trade Center LLC. The Aviation Defendants, Host, Westfield, Con Edison, Port Authority, and WTCP are collectively referred to herein as "Defendants."

## ARGUMENT

**I.      THE 9/11 TERRORIST ATTACKS DO NOT CONSTITUTE
AN ACT OF WAR WITHIN THE MEANING OF CERCLA**

As set forth above, the Second Circuit's mandate to this Court is to determine whether the CERCLA act of war exception, "considered in the context of CERCLA's statutory scheme and the intent of Congress, applies in this case."  In urging this Court to find that the 9/11 terrorist attacks constitute an act of war for CERCLA purposes, Host and the Aviation Defendants base their argument on everything *but* CERCLA jurisprudence and "CERCLA's statutory scheme." As shown below, given the broad application and liberal interpretation of liability that courts afford CERCLA, the act of war defense cannot be applied to the terrorist attacks of September 11th.

**A.      CERCLA's Statutory Scheme**

In keeping with CERCLA's essential purpose of cleaning up hazardous waste, "CERCLA encourages private individuals to clean up environmental hazards by permitting them to recover specified costs of cleanup from parties *defined by CERCLA* to be responsible for the hazards . . . subject only to the statute's *narrow defenses* for damages caused *solely* by acts of God, war, or third parties. 42 U.S.C. § 9607(a), (b)." *Westfarm Assocs. Ltd. P'ship v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 677 (4th Cir 1995) (internal citations omitted) (emphasis added). As set forth in the Complaint, C&W is a private party that incurred response costs for the remediation of hazardous substances from its building.  The Defendants in this case are all operators or owners of facilities from which there was a release of hazardous substances that caused C&W to incur response costs (Compl. ¶¶ 7, 14-15, 20-35, 67, 70-75, 77-78); thus, each is "defined by CERCLA" as a responsible party.  *See* 42 U.S.C. § 9607(a).

"It was Congress' intent that CERCLA be construed liberally in order to accomplish [the statute's remedial goals]." *Gen. Elec. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 285 (2d Cir. 1992); s*ee also B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992).  Consistent with that guiding principle, courts repeatedly reject interpretations of CERCLA that "would frustrate the statute's remedial purpose."  *United States v. E.I. du Pont de Nemours & Co., Inc.*, 341 F. Supp. 2d 215, 255 (W.D.N.Y. 2004); *New York v. Solvent Chemical Co.*, 225 F. Supp. 2d 270, 280 (W.D.N.Y. 2002) ("[T]he term 'arranged for' is not defined in CERCLA.  However, a liberal judicial interpretation of the term is required in order to achieve CERCLA's *overwhelmingly remedial statutory scheme*.") (citations omitted) (emphasis added).

In contrast, to bolster their arguments that the act of war defense should be applied to the terrorist acts of 9/11, the Airline and Host Defendants urge a skewed and narrow interpretation that seeks to inject fault-based liability into CERCLA that is inconsistent with 30 years of CERCLA jurisprudence and its broad remedial purpose. (*See* Host Br. at 9-10; Aviation Br. at 15).  As courts have noted, the contention that the purpose of CERCLA is to force polluters to pay for the consequences of their actions "fails to convey accurately the far-reaching scope of the act."  *United States v. Fleet Factors Corp.*, 819 F. Supp. 1079, 1083-84 (S.D. Ga. 1993). Moreover, "courts applying CERCLA have found the statute's goal to be 'overwhelmingly remedial' and, on that basis, interpreted its provisions liberally in favor of liability."  *Id.*

This underlying purpose is evident when considering that CERCLA is a strict liability statute with few defenses. *See, e.g.*, *United States. v. Alcan Aluminum Corp.*, 964 F.2d 252, 259 (3d Cir. 1992).  The Second Circuit has held that "section 9607(a)(1) unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, *without regard to causation*."  *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.

1985) (emphasis added).  "[C]oncepts, such as causation or knowledge, … are either foreign to [CERCLA] or are explicitly provided for *in a limited fashion* in the defense section of the Act." *Lincoln Props., Ltd. v. Higgins*, 823 F. Supp. 1528, 1536-37 (E.D. Cal. 1992) (emphasis added) (rejecting an interpretation of CERCLA that would "markedly expand the available defenses" and "reduce the efficacy or aggressiveness of the statute" and noting that CERCLA "envisions that sometimes the cleanup must be paid for by those least responsible").

In short, CERCLA's statutory scheme requires a broad application and liberal interpretation in favor of liability, subject only to narrow defenses, one of which is that the release and damages were caused solely by an act of war.

### B.    CERCLA's Legislative History

Any argument that the September 11th terrorist attacks should be considered an act of war for CERCLA purposes is belied by CERCLA's legislative history, which conclusively shows that Congress (i) was aware of the risk of terrorist attacks as a potential cause of environmental contamination and opted not to carve out a separate exception for terrorism; and (ii) considered acts of war separate and distinct from acts of terrorism.

CERCLA's legislative history reveals that in late 1975 and early 1976, hearings were held on a bill, presented as H.R. 10363 (Federal Oil Pollution Liability and Compensation Act), which sought to establish a uniform and comprehensive legal regime governing liability and compensation for damages and cleanup costs caused by oil pollution of the marine environment. At the January 29, 1976 hearing, the Executive Director of the American Maritime Association submitted a statement, as follows:

> I now come to th [sic] standard of liability.  Section 105(a) imposes strict liability upon the vessel that discharges oil, regardless of fault.  The Attorney General's report makes clear that the discharging vessel is liable even where third parties are

responsible for the casualty causing the discharge—another vessel in collision for instance; the sole remedy is by recovery-over.

The only defenses recognized are those where the discharge was caused "solely" by an act of war, hostilities, civil war, or insurrection, or by an act of God. These defenses, moreover, are to be narrowly construed, rather than in accordance with general maritime law, some "truly overwhelming cataclysm" against which no pains could be effective and which was the sole cause of the casualty. **As for acts of war or insurrection, these do not include the acts of terrorists,** one of the sources of greatest current danger. The authors of the report feared that this defense might be "abused" especially in relation to acts of terrorism. They concluded, "that that possibility is not great," because they did not believe that such acts were available in defense.

[Oil Pollution Liability: Hearings on H.R. 9294, H.R. 10969, H.R. 10363, and H.R. 10756 Before the Subcomm. on Coast Guard and Navigation of the H. Comm. on Merchant Marine and Fisheries, 94th Cong. 1st and 2nd Sess. 344 (1976)] (statement of Alfred Maskin, Executive Director, American Maritime Association, presented by Joseph A. Klausner) (emphasis added) (Declaration of Sari E. Kolatch, sworn to on July 6, 2012 ("Kolatch Decl." Ex. 1).

Later, in 1980, Senator Gravel proposed the "Oil Pollution Liability and Compensation Act of 1980" as an amendment to the pending CERCLA bill. 126 Cong. Rec. S10846 (daily ed. Aug. 5, 1980) (statement of Sen. Gravel) (Kolatch Decl. Ex. 2). The proposed amendment provided an exemption from liability "where an owner or operator of a vessel *or an onshore or offshore facility* can prove that a discharge was caused solely by (i) an act of God, (ii) *an act of war, civil war, insurrection, or terrorism,* (iii) an act or omission by a person other than the owner or operator, an employee or agent of the owner or operator, or a person acting in a contractual relationship under the direction of the owner or operator . . ." *Id.* (emphasis added). The proposed amendment was not included in the version of CERCLA that became law.

Thus, Congress clearly recognized at the time it was holding hearings on CERCLA that, for CERCLA purposes, there was a distinction between an act of war and an act of terrorism. Congress was also aware of the fact that an act of terrorism could result in environmental

contamination.  Congress decided, nevertheless, not to expand the exceptions to include an act of

terrorism, and never stated that an act of terror under CERCLA would be subsumed within the

definition of an act of war.  Congress' decision not to expand the CERCLA defenses to include

terrorist attacks demonstrates that Congress did not intend to exclude contamination resulting

from terrorist attacks from CERCLA liability.  To broaden the definition of act of war here

would vitiate Congress' intent.

In 1986, CERLA was amended by the Superfund Amendments and Reauthorization Act

("SARA").  Superfund Amendments & Reauthorization Act of 1986, Pub. L. No. 99-499,

§ 101(35), 100 Stat. 1613 (1986) (codified at 42 U.S.C. § 9601).  The legislative history for that

Amendment shows that a companion bill, H.R. 2817, included the following language:

> Except when the responsible party has failed or refused to report an incident where
> required by law, there shall be no liability under subsection (a) if the responsible party
> proves that the incident (A) resulted from an act of war, hostilities, civil war, insurrection,
> or a natural phenomenon of an exceptional, inevitable, and irresistible character.

H.R. 2817, 99th Cong. § 504  (1st Sess. 1985).  (Kolatch Decl. Ex. 3.)

Congress did not enact this companion bill, and the language expanding the act of war

exception was not included in SARA.  Thus, ten years of CERLCA legislative history make clear

that Congress considered, and repeatedly rejected, the expansion of the act of war defense to

include events that would extend traditional notions of war and did not intend the defense to

encompass terrorist attacks.

### C.   CERCLA 107(b)'s Affirmative Defenses Are Narrowly Construed

This Court's current analysis of whether the events of 9/11 were acts of war within

CERCLA's statutory scheme necessarily must consider CERCLA's broad remedial purpose.  As

shown below, both the legislative history and case law demonstrate that the affirmative defenses

available to CERCLA defendants must be narrowly construed to preserve CERCLA's broad remedial regime.

CERCLA's legislative history is discussed in *United States v. Shell Oil Co.*, *aff'd*, 281 F.3d 812 (9th Cir.), *opinion withdrawn and superceded on denial of reh'g*, 294 F.3d 1045 (9th Cir. 2002) and confirms that Congress intended the limited defenses to be narrowly construed. *Id*. at 971 n.3 (citing legislative history remarking that "the standard of liability ... is intended to be the same as that provided in section 311 of the Federal Water Pollution Control Act; that is strict liability "and that liability" under CERCLA is strict, that is, without regard to fault or willfulness"); *see also United States v. Sterling Centrecorp Inc.*, No. 2:08-CV-02556-MCE, 2011 WL 6749801, at *4 (E.D. Cal. Dec. 22, 2011) (the "defenses should be narrowly construed since CERCLA must be read consistent with [its] broad remedial purpose.") (citations omitted).

In addition to the legislative history cited above, Congressional intent to limit the defenses available under CERCLA also is evident from the fact that in 1986, when Congress amended CERCLA and modified the third party defense to encompass an "innocent landowner defense," it "was careful … to ensure that the innocent landowner exception is narrow." *Shell Oil*, 841 F. Supp. at 973; *see also* H.R. Rep. 99-962, at 186 (1986) ("This new definition of contractual relationship is intended to clarify and confirm that *under limited circumstances* landowners who acquire property without knowing of any contamination at the site and without reason to know  . . . may have a defense.") (emphasis added).

The courts also consistently hold that Congress intended the 107(b) defenses to be narrowly construed.  *See Shell Oil*, 841 F. Supp. at 970; s*ee also Pinhole Point Props., Inc. v. Bethlehem Steel Corp.*, 596 F. Supp. 283, 286 (N.D. Cal. 1984) (contrasting "extremely limited" defenses under section 107(b) with "extremely broad" scope of liability under section 107(a)).

Moreover, "in light of the 'sole cause' limitation," the defenses enumerated in section 107(b) are viewed as extremely restricted." *Shell Oil*, 841 F. Supp. at 970; *see also* 2 The Law of Hazardous Waste: Management, Cleanup, Liability Litigation § 14.01[8][b] at 14–160.3 (Susan M. Cooke, ed.).

Consistent with CERCLA's statutory scheme, the act of war defense must be construed narrowly.  Indeed, the defense has been raised in only a very few reported cases, and courts have rejected any attempt to interpret the defense expansively. *See Coeur D'Alene Tribe v. Asarco Inc.*, No. CV 91-0342NEJL, 0122NEJL, 2001 WL 34139603, at *10 (D. Idaho Mar. 30, 2001) (rejecting the act of war defense for releases due to mining activities, finding that, other than the allegation that the mining activities took place during the period of World War II, the act of war defense had no relevance; in addition, the act of war was not the sole cause of the release.)

In *Shell Oil* (the only case to address the act of war defense in a CERCLA context in any relevant detail) the court rejected the defendants' reliance on the act of war defense to escape CERCLA liability, holding that the exception was to be narrowly construed consistent with the extremely broad liability and remedial CERCLA regime.  The court noted that the term act of war appears to have been borrowed from international law where it is defined as a "'use of force or other action by one state against another' which '[t]he state acted against recognizes . . . as an act of war, either by use of retaliatory force or a declaration of war.'" *Shell Oil*, 841 F. Supp at 972 (internal citation omitted).  Thus, as a threshold, to qualify as an act of war, there must be "use of force *by one state against another*." *Id*; *see also R.E. Goodson Construction Co. v. Int'l Paper Co*., No. C/A 4:02-4184-RBH, 2005 WL 2614927, at *19 (D.S.C. Oct. 13, 2005) (rejecting act of war defense because it "is to be interpreted narrowly" and that the "argument that any governmental act taken by authority of the War Powers Clause is an 'act of war' sweeps

too broadly").  The absence of state action on 9/11 precludes a finding that the terrorist attacks were acts of war for CERCLA purposes.

The Aviation Defendants argue that a commentator quoted in the *Shell Oil* decision "points to 'the environmental terrorism inflicted on the air and water of the Persian Gulf by the troops of Saddam Hussein' as an archetypal example of an act of war."  (Aviation Br. at 5.)  But the quote they rely on is incomplete and taken out of context.  The complete quote is:

> As with acts of God, acts of war offer limited defensive prospects. Even acts of sabotage or criminal intervention are likely to lack the governmental sponsorship or formalization of hostilities that the defense presumes. The awful model for an act of war, perhaps, is the environmental terrorism inflicted on the air and waters of the Persian Gulf by the troops of Saddam Hussein. The event has all the features of a confrontation of *organized forces, acts of state,* massive violence, and overwhelming influence that are unlikely to be found in the domestic U.S. Superfund context.

4 William H. Rodgers, Jr., Environmental Law: Hazardous wastes and substances § 8:13 (C)(3)(c) (1992) (emphasis added).

Thus, the 9/11 terrorist attacks do not fall within what the Aviation Defendants describe as "an archetypal example of an act of war" because they lack the requisite elements of "confrontation of organized forces," and "acts of state." *Id*.

CERCLA's broad remedial scheme, statutory language, legislative history, and jurisprudential treatment, demonstrate that Congress did not intend the act of war defense to be broadly construed to exempt a potentially responsible party from CERCLA liability for releases and damages resulting from a terrorist attack.  The interpretation urged by Host, Westfield, and the Aviation Defendants that would include the 9/11 terrorist attack within the act of war definition for CERCLA purposes must be rejected as it would require a broad construction of this narrow defense and would be inconsistent with CERCLA's statutory scheme and legislative history.

10

D.     **The Weight of Non-CERCLA Authority Indicates that Acts of Terrorism are Not Acts of War**

Excluding terrorism from CERCLA's act of war defense is consistent with other areas of law that provide for acts of war exclusions.

1.       **The Anti-Terrorism Act (the "ATA")**

Enacted in 1991, the ATA grants "a remedy to U.S. nationals and their families who suffered from any injury to an individual or property as a result of international terrorism." *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1338 (D. Utah 2006) (citation omitted); *see also* 18 U.S.C. § 2331 *et seq.*  Under the statute, victims may "pursue renegade terrorist organizations and their leaders, and the resource that keeps them in business, their money." *Estates of Ungar ex. Rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 238 (D.R.I. 2004).  Relief is limited to acts of terrorism; the ATA explicitly excludes any civil action brought on account of acts of war.  18 U.S.C. § 2336(a) ("No action shall be maintained under section 2333 of this title for injury or loss by reasons of an act of war.").  To do so, the ATA distinguishes between an "act of terrorism" and an "act of war," two different types of conflict that Congress intended to be mutually exclusive.  *See Weiss v. Arab Bank, PLC*, No. 06 CV 1623, 2007 WL 4565060, at *4-5 (E.D.N.Y. Dec. 21, 2007).

Under the ATA, "act of war" is defined as:

> any act occurring in the course of (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin.

18 U.S.C. § 2331(4).  Courts interpreting the "act of war" provision under the ATA hold that the exemption is intended to apply only to the hostile acts of one state against another.  For example, in *Biton v. Palestinian Interim Self-Government Authority*, 412 F. Supp. 2d 1 (D.D.C. 2005), a

roadside bombing in a former Israeli settlement of a bus transporting elementary school children

and their teachers was not, as a matter of law, an "act of war."  In so ruling the court held that

> [a]lthough Rules of War and the carnage of battle appear to be incongruous, attacks on civilian non-combatants have been reviled for centuries.  In *Henry II*, Shakespeare will not let us forget the French attack on the English baggage boys at Agincourt.  Many still remember the American revulsion to the My Lai massacre during the Vietnam War, even as we sympathized with the soldiers facing a hidden enemy… [I]t is clear that children are not proper targets of war.  War should be fought between combatants and not between combatants and children.

The fact that the United States may be engaged in a "war against terror" or may be "at

war" does not mean that the 9/11 terrorist attacks were an act of war.  In *Morris v. Khadr*, 415 F.

Supp. 2d 1323 (D. Utah 2006), plaintiff was injured in an attack by al Qaeda members while

serving in the U.S. Army in Afghanistan.  The court found that he had standing to sue under the

ATA because al Qaeda is "not a 'military force of any origin'" and is not a nation and therefore

does not fit within the ATA's act of war exclusion.  *Id.* at 1333-34.  Therefore, although the

United States sent troops to Afghanistan to fight al Qaeda, al Qaeda's 9/11 terrorist attack does

not constitute an act of war for the purposes of the ATA defense.

Tellingly, the court drew a firm line between acts of war and acts of terrorism:

> There are undoubtedly differences between military forces and terrorists. …As between these two possibilities, Al Qaeda fits only in the latter.  Al Qaeda is not 'nation'; the people who fight in its behalf thus cannot be 'armed forces' or the 'military.' It is, instead, a 'group' that systematically uses violent and destructive acts in its attempts to coerce the United States into acceding to its demands.

*Id.* at 1334; s*ee also Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 166 (D.D.C.

2006) (terrorist attack on a public bus in which all of the passengers were civilians violated

"established norms of warfare and armed conflict under international law" and, was not,

therefore, an "act of war" for purposes of the ATA); *Weiss*, 2007 WL 4565060, at *5 (no basis

for application of the "act of war" exclusion given "the express allegations of the Complaint, that the Terror Victims were killed by individuals working for designated terrorist organizations"); *Sokolow v. Palestine Liberation Org.*, 583 F. Supp. 2d 451, 459 (S.D.N.Y. 2008) (same).

Congress intended the ATA to have "broad scope," and the courts have interpreted the ATA broadly to accomplish this goal. *Morris,* 415 F. Supp. 2d at 1338.   As shown above, CERCLA likewise is interpreted to impose broad liability and allow for only narrow defenses. Thus, this Court should maintain the ATA's distinction between acts of war and terror in order to interpret the act of war defense narrowly, consistent with CERCLA's statutory scheme, and not subsume within it the September 11th terrorist attacks.

## 2.   Acts of Terrorism Under Insurance Law

Act of war also arises in the arena of insurance law within the context of coverage exclusions.   Here also, courts addressing the issue have limited the act of war exclusion to the acts of nations (or quasi-national entities) acting in a national military capacity, or actions by defined groups acting with the express purpose of ousting an existing government.

The leading case in the Second Circuit is *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989 (2d Cir. 1974) ("*Pan Am*").   That case arose out of a 1970 hijacking of a Pan Am aircraft over London by the Popular Front for the Liberation of Palestine (the "PFLP").   The PFLP blew up the aircraft, causing Pan Am a loss of over $24 million.   *Id*. at 993.   On the same day, the PFLP hijacked a TWA airliner departing Frankfurt and a Swissair jet leaving Zurich, while being foiled in an attempt to hijack an El Al airliner. *Id*. at 999.   The TWA and Swissair planes were both flown to a Jordanian airfield and blown up while surrounded by Jordanian troops.   *Id*.

When Pan Am sought to recover from its insurance providers, its "all risk" insurers asserted the policy's act of war exclusion as a defense to liability. The Second Circuit noted that the insurers bore the burden of proving that the loss fell within the exclusion. *Id*. at 1006.

The court held that a "war" for insurance policy interpretation required a conflict between sovereign or quasi-sovereign nations. *Id*. at 1005. The Court found that the PFLP was not a sovereign that could engage in a war; thus, the act of war exclusion did not apply. *Id*. at 1015; *see also Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460, 1500-03 (S.D.N.Y. 1983) (court did not apply act of war exclusion to destruction of hotel in Beirut by terrorists because, among other reasons, the terrorists were not even "quasi-sovereign entities").

Like the attacking entities in *Pan Am* and *Holidays Inns*, al Qaeda is neither a sovereign nor a quasi-sovereign entity. Al Qaeda is not a recognized government entity; nor does it attempt to seek such status. Thus, Second Circuit case law dictates that an "act of war" exclusion would not apply to the 9/11 attacks.

In *Pan Am*, the Second Circuit read the act of war exclusion narrowly because of judicial preference for coverage. 505 F.2d at 1003-04. Given CERCLA's broad mandate, the act-of-war defense likewise should be construed narrowly here to preclude its application to the 9/11 terrorist attacks.[5]

---

[5] A determination that the 9/11 terrorist attacks was not an act of war for CERCLA purposes does not leave the defendants without any recourse. Indeed, one commentator noted that "[t]he most viable defense for a party faced with liability arising from a terrorist attack might be CERCLA's third party defense. Antonio J. Rodriguez, *When Your Ship Is in the Bull's Eye: The Maritime Transportation Security Act and Potential Vessel Owner Liability to Third Parties Resulting from A Terrorist Attack*, 17 U.S.F. Mar. L.J. 241, 283 (2005). Thus, this Court need not find that the terrorist attack was an act of war to provide defendants with the ability to raise a defense to this CERCLA action. In any event, "burdensome consequences are not sufficient grounds to judicially graft an exemption onto a statute, a graft that would thwart the language, purpose, and agency interpretation of the statute." *B.F. Goodrich Co*, 958 F.2d at 1206 (2d Cir. 1992) (finding that CERCLA imposes liability on municipalities disposing of household waste that contains hazardous substances.)

## II.   ON THIS RULE 12(C) MOTION, DEFENDANTS CANNOT RELY ON PURPORTED FACTS OUTSIDE THE PLEADING TO ESTABLISH THAT THE TERRORIST ATTACK WAS AN ACT OF WAR

The standard for granting a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is identical to that of a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim.  *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998).  In both motions, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor.  *Id.*  Critically, matters outside the parties' pleadings cannot provide the basis for a Rule 12(c) dismissal.  *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) (dismissal under Rule 12(c) based on matters outside the pleadings is inappropriate).

The Aviation, Host and Westfield Defendants seek to prove their affirmative defense that the terrorist attacks of September 11, 2001 constituted an act of war for CERCLA purposes based largely on extrinsic evidence, much of which is selective rhetoric, concerning disputed issues of material fact.  The defendants either simply rely on extrinsic evidence or, under the rubric of judicial notice, ask this Court to consider substantive, disputed facts outside the pleadings.[6]  This is wholly inappropriate on a motion for judgment on the pleadings.  Indeed,

---

[6]      To the extent that whether or not the 9/11 attack constituted an act of war for CERCLA purposes is factual in nature, a dismissal cannot be granted unless those facts – which necessarily include facts extrinsic to the pleadings – are fully established.  Taking evidence on judicial notice should be exercised cautiously, if at all.  Fed. R. Evid. 201(b); Fed. R. Evid. 201 advisory committee's note.  ("The usual method of establishing adjudicative facts is through the introduction of evidence, ordinarily consisting of the testimony of witnesses…    A high degree of indisputability is the essential prerequisite. . . With respect to judicial notice of adjudicative facts, the tradition has been one of caution in requiring that the matter be beyond reasonable controversy.  This tradition of circumspection appears to be soundly based, and no reason to depart from it is apparent."); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (rejecting the lower court's reliance on extraneous documents used not to establish their existence, but rather to provide the reasoned basis for concluding that "the record shows that [plaintiff] cannot be expected to pay its obligations to the City in a timely or honest manner"); *see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) ("Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy.").

both the WTCP and Con Edison Defendants acknowledge that a determination of whether the act of war defense is applicable here cannot be resolved on this Rule 12(c) motion.

Rather than limiting their recitation of facts to the four corners of Plaintiff's complaint and amplified-pleading, the Aviation and Host Defendants (joined by Westfield) rely upon cherry-picked headlines, newspaper articles and transcripts of interviews from among the universe of sources discussing the 9/11 terrorist attacks in an attempt to demonstrate that those events constituted an act of war. While the court may indeed take judicial notice of the fact that such extrinsic sources exist, it should not accept those sources for the truth of the matters stated therein. *See In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010), *reconsideration denied* 09 MD 2058 PKC, 2010 WL 4237304 (S.D.N.Y. Oct. 8, 2010) ("On a motion to dismiss, a court may take judicial notice of the publication of a newspaper article without converting the motion into one for summary judgment, provided that consideration is limited to the fact of publication and not the truth of the article's content.").

The Host, Aviation and Westfield Defendants' arguments that the September 11th attack constituted an act of war are based in large part upon rhetorical and colloquial statements made by politicians and journalists in the wake of 9/11, none of which are properly considered on a Rule 12(c) motion. Moreover, as shown below, there are other statements in the public record that flatly contradict the "evidence" offered by those Defendants, which demonstrate why this Court cannot rely on the extrinsic materials offered by those Defendants.[7]

---

[7]     It should not be forgotten that Defendants bear the burden of proof on this affirmative defense which they cannot meet without affording Plaintiff the opportunity to develop a full factual record and to counter their selective proffer of extrinsic facts.

The Aviation Defendants argue that two presidents, Congress, NATO and al Qaeda all determined that the 9/11 terrorist attacks constituted an act-of-war against the United States. [8] They argue that this alleged determination should control for CERCLA purposes.  (Aviation Br. at 2.)  Putting aside the fact that this Court should not rely on this extrinsic, extra-pleading "evidence," many of the statements on which the Aviation Defendants rely do not support that contention.  Moreover, there are numerous contradictory statements by representatives of the various branches of government that the Aviation Defendants ignore.[9]

For example, a January 2002 memorandum from the Justice Department (the "Justice Dep't Memo") (Kolatch Decl. Ex. 4), concluded that al Qaeda and the Taliban are not entitled to the protections of the Geneva Convention extended to prisoners of war.  In reaching that conclusion, the Justice Department noted that that although Afghanistan was a party to the Geneva Conventions, the treaties "do not protect members of the al Qaeda organization, which as a non-State actor cannot be a party to the international agreements governing war."  *Id*. at 1.  The Justice Department concluded that al Qaeda was "a non-governmental terrorist organization composed of members from many nations, with ongoing operations in dozens of nations."  *Id.* at 9.  It further found that al Qaeda does not constitute the armed forces, volunteer forces or militia of a state party entitled to protection under the Geneva Convention because, among other things, its members and operatives "have attacked purely civilian targets of no military value; they refused to wear uniform or insignia or carry arms openly, but instead hijacked civilian airliners,

---

[8]      Al Qaeda's "fatwa" declaring a "holy war" against the west is nothing more than "radical rhetoric" and cannot be relied upon to support the proposition that the 9/11 terrorist attacks constituted an act of war for CERCLA purposes.  *See Pan Am*, 505 F.2d at 1015 ("PFLP's self-serving propaganda claiming that the PFLP was effectively at war with the entire Western World" was "radical rhetoric" that "cannot affect the outcome of this insurance case.").

[9]      The documents referred to herein are not being offered for the truth of the matters set forth therein, but solely to illustrate that conflicting facts exist to those presented by certain of the Defendants concerning the classification of the 9/11 terrorist attacks as an act of war.

took hostages, and killed them; and they themselves do not obey the laws of war concerning the protection of the lives of civilians or the means of legitimate combat." *Id.* at 10.

On February 7, 2002, President Bush issued a memorandum (the "White House Memorandum," Kolatch Decl. Ex. 5) determining that, among other things, (i) the Geneva Conventions did not apply to al Qaeda and (ii) that none of the Taliban captives were lawful combatants entitled to prisoner of war status under the Geneva Conventions.

Host's reliance on statements by members of Congress, made in the immediate aftermath of September 11th, that characterized the terrorist attack as acts of war against the U.S., is misplaced. (Host Br. at 5-6.)  Those statements, made mere hours after the attacks, while first responders labored at the crash sites were not the result of a dispassionate legal analysis within the context of CERCLA.  Indeed, on September 17, 2001, the House Committee on Financial Services sent a letter to the president of the National Association of Insurance Commissioners, Kathleen Sebelius, urging the insurers not to  invoke "exclusions of war" in an attempt to deny coverage as a result of the attacks.  The letter in fact sought to persuade insurers to disregard the statements of government officials characterizing the terrorist attacks as acts of war, expressly acknowledging, in no uncertain terms, that those statements were mere rhetoric necessary to prepare the nation for what lay ahead:

> Through necessity our government is voicing outrage through words of war.  This is critical to prepare our country for the difficult battle ahead.  **But this rhetoric reflects the passion and determination of our country, not the legal reality of Tuesday's destruction.**  We do not believe that any just interpretation of last Tuesday's tragic events would permit an insurer or reinsurer to invoke an 'act of war' exclusion to escape its obligations of Tuesday's tragedy.

*Reprinted in* "Congressional Leaders Urge Industry to Fulfill," Insurance Journal (Sept. 20, 2001),  *available   at*   http://www.insurancejournal.com/news/national/2001/09/20/14323.htm (Kolatch Decl. Ex. 6.)

In fact, when Congress took legislative action a week after the attack, the resulting bill made no mention of war, but rather spoke only of acts of terrorism.  The Authorization for Use of Military Force (the "AUMF," Kolatch Decl. Ex. 7), signed into law by President Bush on September 18, 2001, authorized the use of "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States . . ." Authorization for Use of Military Force, Pub. L. 107–40, 115 Stat 224 (2001).  Similarly, the preamble to the AUMF describes the events of September 11th as "acts of treacherous violence," not war.  *Id.*[10]

With regard to the alleged pronouncements of the international community, none of the U.N. or NATO documents cited by the Host or Aviation Defendants ever uses the term "war." The United Nations Security Council, in a resolution passed on September 12, 2001 to condemn the events of September 11th, specifically referred to "terrorist attacks," and recognized the inherent right of any state to engage in self-defense against "international terrorism."  S.C. Res 1368 (Sept. 12, 2001) (Kolatch Decl. Ex. 8).  In a second resolution passed on September 28, 2001, the Security Council called upon member states to work collectively to suppress international terrorism, including by "[e]nsur[ing] that any person who participates in the financing, planning, preparation or perpetration of terrorist acts or in supporting terrorist acts is brought to justice and ensure that, in addition to any other measures against them, **such terrorist acts are established as serious criminal offences in domestic laws and regulations and that**

---

[10]     Host cites to a single law review article for the proposition that the AUMF has been "widely recognized" as the equivalent of a formal declaration of war.  Curtis A. Bradley and Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005).  Host fails to note, however, that that very article acknowledges the views of other commentators that the conflict with al Qaeda is not a war in the traditional sense, but rather a metaphorical war, akin to the war on drugs, war on poverty, or war on crime. *Id.*

**the punishment duly reflects the seriousness of such terrorist acts.**"  S.C. Res. 1373 (Sept. 28, 2001) (emphasis added) (Kolatch Decl. Ex. 9); *see also* S.C. Res. 1378 (Nov. 13, 2001) ("*Condemning* the Taliban for allowing Afghanistan to be used as a base for the export of terrorism by the Al-Qaida network and other terrorist groups and for providing safe haven to Usama Bin Laden, Al-Qaida and others associated with them, and in this context supporting the efforts of the Afghan people to replace the Taliban regime.") (Kolatch Decl. Ex. 10.)  Those resolutions never mention the terms "war" or "armed conflict," let alone define the September 11th attacks as acts of war.

Similarly, NATO, in stating that its members would assist the U.S. in accordance with Article 5 of the North Atlantic Treaty, initially characterized the attacks as "acts of barbarism." (Kolatch Decl. Ex. 11) NATO's Secretary General subsequently characterized the attacks as acts of terrorism, noting that "[w]e know that the individuals who carried out these attacks were part of the **world-wide terrorist network of Al-Qaida**, headed by Osama bin Laden and his key lieutenants and protected by the Taleban [sic]," and "reiterate[d] that the United States of America can rely on the full support of its 18 NATO Allies in the campaign against **terrorism**." Lord Robertson, Secretary General, NATO, Opening Statement at Press Conference on Most Recent Developments Following the Terrorist Attacks of 11th September (Oct. 2, 2001). (Kolatch Decl. Ex. 12.)

Finally, Host, Westfield and the Aviation Defendants overstate the significance of *Hamdan v. Rumsfeld*, 548 U.S. 547 (2006).  In *Hamdan*, the Supreme Court held that the defendant could not be tried before a military commission because, among other reasons, he was not alleged to have violated the laws of war.  The issue before the Court, however, was not whether the events of September 11th constituted an act of war for CERCLA purposes, and all

references to a war starting on September 11th was pure dicta, mentioned in a footnote, to explain

why the majority disagreed with the dissent. In sum, the issue in *Hamdan* was limited to whether

the government had the power to convene military commissions.  There is no legal or factual

basis to find that the Court's notation in a footnote means that the 9/11 terrorist attacks was an

act of war within CERCLA's statutory scheme.

Moreover, in *U.S. v. Farhane*, 634 F.3d 127 (2d Cir. 2011), the Court did not classify the

9/11 terrorist attacks as acts of war, but merely noted that two administrations have stated that

the nation is at war with al Qaeda.  *See id*. at 135 n.7.  That does not convert the terrorist attacks

into an act of war for CERCLA purposes.  Likewise, the statement in *Padilla v. Hanft*, 432 F.3d

582, 586 (4th Cir. 2005) that al Qaeda, "having engaged in acts of war against the United States

abroad, have crossed our borders with the avowed purpose of attacking this country and its

citizens from within" was pure dicta and has no bearing on the issue before this Court.  Thus,

none of these cases can be relied on in the CERCLA context.

## III.   DEFENDANTS CANNOT ESTABLISH ON A RULE 12(c) MOTION THAT THE 9/11 TERRORIST ATTACKS WERE THE SOLE CAUSE OF THE RELEASE

To prevail on the act of war affirmative defense, Defendants must prove, by a

preponderance of the evidence, not only that the 9/11 terrorist attacks constituted an act of war

under CERCLA, but also that it was the "sole cause" of the "release or threat of release of

hazardous substances and the damages resulting therefrom."  42 U.S.C. § 9607 (b).  Defendants

have not, and cannot, meet that burden.[11]

---

[11]     Defendants must prove the sole cause requirement by a preponderance of the evidence.  *See United States v. A & N Cleaners & Launderers, Inc.*, 854 F. Supp. 229, 239 (S.D.N.Y. 1994) ("A defendant's failure to meet its burden on any one of the required elements precludes application of the defense.").

Notably, three of the defendants WTCP, Con Edison,[12] and Port Authority[13]) do not even claim that the alleged act of war was the "sole cause" of the release of hazardous substances and the damages resulting therefrom.  Indeed, WTCP explicitly rejects the notion that the September 11th terrorist attacks were acts of war, acknowledging that a determination of whether or not the terrorist attacks were the "sole cause" of the release and resulting contamination is necessarily an issue of fact that cannot be determined on a Rule 12(c) motion. (WTCP Br. at 4.)  WTCP further notes that, in separate lawsuits against the Aviation Defendants, it has been alleged that the damages from the September 11 attacks are attributable to the negligence of the airlines, which precludes a finding on a Rule 12(c) motion that defendants have met their burden to prove the "sole cause" requirement.

Host glosses over the "sole cause" requirement of the act of war defense by arguing that the Court has already noted that that the release would not have occurred "but for" the attacks, or simply by asserting (without citation) that the terrorist attacks solely caused the release.  (Host Br. at 1.)  Such self-serving statements fail to satisfy Host's burden to prove the sole cause element of the defense.  Importantly, the issue of whether the attacks were the sole cause of the release has not been before this Court in this CERCLA action because it is not a pleading requirement with respect to Plaintiff's prima facie case.

Moreover, a motion for judgment on the pleadings should not be granted against a plaintiff simply because the pleadings do not include allegations that would overcome defendant's affirmative defense.  *See, e.g.*, *Delson v. Minogue*, 190 F. Supp. 935, 936 (E.D.N.Y.

---

[12]     Con Edison cannot assert the act of war defense in this litigation because it has taken a contrary position—namely, that the collapse of WTC 7 (and in turn the release of hazardous substances from WTC 7) was caused by factors other than the crash—in a separate litigation currently on appeal to the Second Circuit, styled *Aegis Ins. Services, Inc. v. 7 World Trade Co., L.P.*, 11-4403-CV (2d Cir.) (Con Edison Br. at 2.)

[13]     Port Authority does not directly address the "sole cause" issue in its brief, but rather advances a novel, and meritless, argument that terrorist attacks should be excluded from CERCLA liability regardless of whether they constitute acts of war.  (Port Authority Br. at 2-5.)  Plaintiff responds to that argument *supra*.

1961); *see also Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F. 2d. 228, 230 (9th Cir. 1989) (judgment on the pleadings generally unavailable to a defendant where his answer raises affirmative defenses). Whether the attacks were the sole cause of the release is inherently factual in nature, and it is Defendants burden to prove sole cause. As but one example, whether the Airline Defendants were negligent in allowing terrorists to board the airplanes and access the cockpit, in an issue of fact that cannot be decided on this Rule 12(c) motion.[14]

The Airline Defendants contend that statements in the Complaint and the Amplification that the release was a "direct result of the events of September 11, 2001" are an acknowledgment that the crash of the airplanes into the twin towers was the sole cause of the CERCLA release. (*See* Airline Br. at 14.) That contention is incorrect. The Pleading never alleges that the terrorist attacks on September 11th were the sole cause of the release. First, the Pleading references the "events of September 11, 2001" not the "terrorist attacks." Second, simply because the attacks were a cause or a direct cause of the release does not preclude concurrent causes. It is a Defendants burden to prove that it is the *sole* cause.

The Defendants' argument that the release would not have occurred "but for" the purported act of war begs the question. The standard is not "but for," it is "sole cause." As

---

[14]        Westfield wholly mischaracterizes Plaintiffs' counsel's response to a question posed at oral argument before the Second Circuit as an acknowledgment that Plaintiffs' "claims would also fail if the September 11 attacks constituted an 'act of war' under the statutory defense set forth in 42 U.S.C. 9607(b)(2)." (Westfield Br. at 1.) Plaintiff's counsel only acknowledged that the act of war defense would be available to defendants if the panel found that that "an act of terrorism in this context is an act of war" but certainly did not acknowledge that defendants could *prevail* on that defense. (Barry Decl. Ex. C, at 31:12-15.) The act-of-war is only one prong of the defense, and while all of the defendants may be able to raise the defense if it is determined that the 9/11 terrorist attacks were acts of war, they still must prove the sole cause requirement by a preponderance of the evidence. *See* 42 U.S.C. 9607 (b)(2). Indeed, as discussed *supra* some of the defendants themselves take the position that the release and resulting damage was not solely caused by the terrorist attacks.

stated above, the burden of proof that the purported act of war was the sole cause of the release

rests on the Defendants, and they have not satisfied that burden.[15]

## IV.   A JUDICIAL DETERMINATION THAT A TERRORIST ACT CAN BE AN ACT OF WAR HAS FAR REACHING AND UNACCEPTABLE CONSEQUENCES

A determination by this Court that CERCLA's act of war defense applies to the 9/11

terrorist attacks will have far reaching and unacceptable ramifications beyond the CERCLA

context.   Some of the Defendants may claim that the Court can rule affirmatively and

nonetheless avoid these consequences by issuing a narrow holding whose application is limited

to CERCLA.   However, in order to do so, the Court would need to rely only on the CERCLA-

related materials it has at its disposal: the statute, the case law interpreting it, the legislative

history, or some combination of the three.   But, as shown above, these sources simply do not

support any ruling that the terrorist event of 9/11 consituted an act of war.

Host, Westfield and the Aviation Defendants themselves recognize this dilemma, which

they attempt to circumvent by citing to and relying on materials that discuss and define the

phrase in other, non-CERCLA contexts.   Even the Defendants implicitly acknowledge that for

---

[15]     The Airline Defendants' reliance on *Shell Oil* for the proposition that while CERCLA is a strict liability statute it "nonetheless requires a volitional act—some choice—over the waste disposal that leads to the release" is misplaced. (Airline Br. at 16.)  *Shell Oil* involved 107(a)(3) liability, which addresses liability for persons who "arrange" for the disposal of hazardous substance.  *United States v. Shell Oil*, 294 F. 3d 1045, 1054-55 (9th Cir. 2002).  Unlike 107(a)(1) or (a)(2), this provision specifically requires an affirmative act in the form of "evidence that the transaction includes an 'arrangement' for the ultimate disposal of a hazardous substance."  *Freeman v. Glaxo Wellcome Inc.*, 189 F.3d 160, 164 (2d Cir. 1999).  Thus, the Court's determination in *Shell Oil* that defendants could not meet their burden to show that an act of war was the "sole cause" of the contamination because they could have arranged for disposal of the hazardous substance in any way they chose speaks to the arranger liability element of the claim—which is wholly irrelevant here.  Sections 107(a)(1) and 107(a)(2) liability concerns a party's status – *i.e.,* whether he was the owner or operator of a facility at the time an event occurred (i.e., a release or threatened release, and/or a disposal)—and unlike 107(a)(3), do not concern a party's actions.

the Court to make a sustainable finding in their favor, it must accept that "act of war" is a term of art, with a generally understood meaning that goes beyond CERCLA. For the Court to base its decision, in whole or in part, on the non-CERCLA materials Defendants cite, it necessarily and unavoidably must incorporate in its ruling this broad understanding of act of war.[16]  Before the Court engages in such a sweeping determination, it should evaluate and consider the wide-ranging consequences such a ruling will have.

*First*, a declaration that the 9/11 terrorist attacks were acts of war would mean that at least some terror victims could no longer seek civil damages under the ATA, a result that is squarely at odds with the statute's very purpose. *Second*, such a determination would mean that al Qaeda terrorists are entitled to the rights of soldiers under the Geneva Conventions and U.S. Military Protocol, including the right to engage in acts of war without penalties under U.S. domestic law. *Third*, a finding that the 9/11 terrorist attacks were acts of war could leave terror victims open to denial of insurance coverage, since most all-risk insurance policies contain act of war exclusions and the insurance industry as well as the Second Circuit has consistently operated under the assumption that "acts of war" are legally distinct from "acts of terrorism."

### A.   Terror Victims May No Longer Be Able To Seek Damages Under The ATA

The ATA grants "a remedy to U.S. nationals and their families who suffered from any injury to an individual or property as a result of international terrorism."  *Morris*, 415 F. Supp. 2d at 1338 (citation omitted).  As noted above, relief is limited to acts of terrorism; the ATA explicitly excludes any civil action brought on account of acts of war.  18 U.S.C. § 2336(a) ("No action shall be maintained under section 2333 of this title for injury or loss by reasons of an act

---

[16]     Westfield recognizes that a determination that the 9/11 terrorist attacks constituted "an act of war" could have potential negative ramifications beyond this case and therefore urges the court to find that terrorist attacks were acts of war for CERCLA purposes only.  (Westfield Br. at 2.)  The Court could make such a finding only if it relies solely on CERCLA-related materials to reach its conclusion.  It is incongruous to argue that the Court should look outside of the CERCLA context to reach a determination that the 9/11 terrorist attacks was an act of war but should restrict that finding to CERCLA purposes only.

of war."). To do so, the ATA distinguishes between an "act of terrorism" and an "act of war," two different types of conflict that Congress intended to be mutually exclusive. *See Weiss*, 2007 WL 4565060, at *5.

A determination by this Court that the 9/11 attacks were acts of war would mean that an attack committed by a terrorist group could be considered an "act of war" under the ATA. As a result, the victims of such an attack would not be entitled to damages, and the terrorist organization responsible for the attack could thereby evade any monetary liability. This outcome is not only intuitively unconscionable, but is also at odds with the intent and purpose of the ATA and with the cases interpreting the ATA that have held that terrorist organizations like al Qaeda cannot perpetrate acts of war.

Congress intended the ATA "to provide a new civil legal cause of action for international terrorist acts against U.S. nationals." H.R. Rep. 102-1040, at 4 (1992). The ATA was designed to have a broad scope, and to extend liability under the statute "to all points along the causal chain of terrorism." *See Morris*, 415 F. Supp. 2d at 1330 (citing *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1020 (7th Cir. 2002)). To find that an attack committed by a terrorist group constitutes an act of war "would pervert the very purpose of the ATA, which was enacted to deter terrorist activity and hold liable those who engage in it." *Weiss*, 2007 WL 4565060 at *5.

The potential evisceration of any meaningful distinction between war and terrorism leaves terror victims without civil recourse. For example, such a result would have a resounding affect on the victims of terrorist attacks in Israel, a perpetual target of terrorist organizations that often times involve citizens of the United States. Indeed, the majority of cases analyzing the "act of war" question under the ATA arise from attacks occurring in Israel. *See Sokolow*, 583 F. Supp. 2d 451; *Weiss*, 2007 WL 4565060; *Estate of Klieman*, 424 F. Supp. 2d 153; *Biton*, 412 F.

Supp. 2d 1.  Until now, courts have consistently held that the victims of such attacks are entitled to compensation under the ATA, but these types of victims would be denied any recovery if terror acts were considered acts of war.

### B.     Al Qaeda Terrorists Could Be Entitled To The Rights of Soldiers Under U.S. Military Protocol And The Geneva Conventions

If this Court finds that the 9/11 attacks were acts of war, then their perpetrators may be entitled, under both international and domestic standards, to certain rights given to soldiers engaged in lawful wartime combat but not otherwise granted to criminals or terrorists.  The Third Geneva Convention guarantees certain rights to soldiers captured while committing acts of war. *See* Geneva Convention Relative to the Treatment of Prisoners at War, art. 3, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; *see also United States v. Pineda*, No. CR. 04-232, 2006 WL 785287, at *2 (D.D.C. Mar. 28, 2006).  The U.S. military also recognizes that there are distinct rights for soldiers not afforded to criminals:  the Army Field Manual 27-10, for example, incorporates the protections for prisoners of war set out in the Third Geneva Convention.  *See* United States Army Field Manual 27-10, Law of Land Warfare, at ch. 3 (1956); *see also* Lieber Code, War Dep't, Instructions for the Gov't of Armies of the United States in the Field, General Orders No. 100, ¶ 56 (1863).

For example, the Third Geneva Convention grants soldiers the right to be tried only for crimes unrelated to hostilities.  *See, e.g.*, *United States v. Lindh*, 212 F. Supp. 2d 541, 553 (E.D. Va. 2002) (explaining that when Articles 87 and 99 of the Third Geneva Convention are read together, it is made "clear that a belligerent in a war cannot prosecute the soldiers of its foes for the soldiers' lawful acts of war").  This protection makes soldiers "immune from criminal prosecution by their captors" for crimes such as murder or kidnapping, *Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564, 592 (S.D.N.Y. 2002), "unless those offenses are unrelated to the

conflict, or violate the law of war or international humanitarian law," *United States v. Khadr*, 717 F. Supp. 2d 1215, 1222 (Ct. Mil. Comm'n Rev. 2007).  *See also Johnson v. Eisentrager*, 339 U.S. 763, 793 (1950) (Black, J. dissenting) ("[L]egitimate 'acts of warfare,' however murderous, do not justify criminal conviction. . . . It is no 'crime' to be a soldier.").

Similarly, the Third Geneva Convention also provides that soldiers are entitled to return home without delay once the war is completed.  6 U.S.T. 3316, at Art. 118 ("Prisoners of war shall be released and repatriated without delay after the cessation of active hostilities.").  Indeed, as the Supreme Court noted in *Hamdi v. Rumsfeld*, it is an "established principle of the law of war that detention may last no longer than active hostilities."  542 U.S. 507, 520 (2004) (plurality opinion); *see also* War Dep't, Rules of Land Warfare ¶ 61 (1914) (explaining that the purpose of this rule "is solely to prevent prisoners from further participation in the war").

By labeling the 9/11 attacks an act of war, this Court would invite numerous potentially troublesome consequences.  Under both international law and U.S. military protocol, terrorists may no longer be liable for any crimes related to an act of war, may be permitted to return home at the end of hostilities, and may be entitled to preferential treatment while detained.  And the unwarranted benefits extend beyond those terrorists involved in 9/11.  Holding that this single attack is an act of war would likely set a dangerous precedent for the treatment of terrorists in the future.  To avoid providing terrorists with equal protection under the Geneva Conventions and corresponding US military protocol, this court must find that the 9/11 attacks were not acts of war.

Another far-reaching consequence of a determination that the 9/11 attacks were acts of war is that insurance coverage may be denied to future victims of terrorist attacks.  The insurance industry has always operated under the assumption that "acts of war" are legally distinct from

28

"acts of terrorism," an understanding that has persisted in the aftermath of the 9/11 terrorist attacks and one that has been confirmed by the Second Circuit, which has explicitly held that act of war exclusions in all-risk insurance policies *do not* include acts of terrorism.  See section I.D.2, *supra* at 13-14.

A finding that 9/11 is nonetheless an act of war creates a direct conflict with this established precedent and may lead to the denial of insurance coverage to deserving terror victims.

## CONCLUSION

The Aviation Defendants conclude their moving brief with a result oriented plea—it matters not how one gets there as long as the case is dismissed.  (Aviation Br. at 17.)  This approach should be rejected.  As the Second Circuit previously noted in a case involving another violent terrorist attack, "[t]he bombing of Pan Am Flight 103 was an act of terrorism that has properly drawn the condemnation of the world community. Horrific as that act was, it cannot provide a basis for giving an unwarranted interpretation to an act of Congress simply to achieve a result beneficial to the families of the victims of the bombing."  *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 247 (2d Cir. 1996).  Similarly, the 9/11 terrorist attacks were horrific acts of terrorism that have properly drawn the condemnation of the world community—but that cannot provide a basis to redefine the act of war exception under CERCLA in a manner that is inconsistent with CERCLA jurisprudence, legislative history and its statutory scheme.

For all the foregoing reasons this Court should find that CERCLA's act of war exception does not apply to the 9/11 terrorist attacks.

Dated:  July 6, 2012
      New York, New York

                    COHEN TAUBER SPIEVACK & WAGNER P.C.


                By: */s/ Sari E. Kolatch*
                    Jay B. Spievack
                    Sari E. Kolatch
                    420 Lexington Avenue, Suite 2400
                    New York, NY 10170
                    (212) 586-5800 (phone)
                    (212) 586-5095 (fax)
                    skolatch@ctswlaw.com