UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

IN RE SEPTEMBER 11 LITIGATION                                        :        21 MC 101 (AKH)

                                                                     :

CEDAR & WASHINGTON ASSOCIATES, LLC,                                  :

            Plaintiff,                                               :

                                                                     :        **ORDER AND OPINION**
    -against-                                                        :        **APPLYING CERCLA'S "ACT**
                                                                     :        **OF WAR" DEFENSE TO**
                                                                     :        **DENY PLAINTIFF'S CLAIMS**
THE PORT AUTHORITY OF NEW YORK AND NEW               :
JERSEY, SILVERSTEIN PROPERTIES, INC., WORLD          :        08 Civ. 9146 (AKH)
TRADE CENTER PROPERTIES LLC, SILVERSTEIN             :
WTC MGMT. CO. LLC, 1 WORLD TRADE CENTER              :
LLC, 2 WORLD TRADE CENTER LLC, 3 WORLD               :
TRADE CENTER LLC, 4 WORLD TRADE CENTER               :
LLC, 7 WORLD TRADE COMPANY, L.P., HMH                :
WTC, INC., HOST HOTELS AND RESORTS, INC.,            :        
WESTFIELD WTC LLC, WESTFIELD                         :
CORPORATION INC., CONSOLIDATED EDISON                :
COMPANY OF NEW YORK, AMR CORPORATION,                :
AMERICAN AIRLINES, INC., UAL CORPORATION,            :
and UNITED AIRLINES, INC.,                           :

                                                                     :

            Defendants.                                              :
-------------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

            Plaintiff, Cedar & Washington Associates, LLC ("Cedar & Washington"), the

owner of a 12-story property at 130 Cedar Street, one block south of the World Trade Center in

lower Manhattan, filed this lawsuit to recover substantial cleanup and abatement expenses to

remove pulverized dust that infiltrated into its building from the collapse of the Twin Towers on

September 11, 2001. Plaintiff sued the Port Authority of New York and New Jersey, Inc. ("Port

Authority") as the owner of the World Trade Center; various corporations affiliated with New

York real estate developer Larry Silverstein as lessees of the World Trade Center ("Silverstein Defendants");[1] various other defendants involved with the World Trade Center ("Ground Defendants");[2] and American Airlines, Inc. and United Airlines, Inc., and their holding corporations,[3] whose airplanes were hijacked and who had responsibility for screening the passengers who boarded the planes ("Aviation Defendants").

Defendants collectively filed a motion to dismiss Cedar & Washington's claim. I held that plaintiff had failed to state a legally sufficient claim for relief under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601, et seq., and I dismissed the complaint. Order, 21 MC 101, 08 Civ. 9146, Sept. 21, 2010. Specifically, I held:

1. The six-year statute of limitations had expired. 42 U.S.C. §9613(g)(2)(B); Schaefer v. Town of Victor, 457 F.3d 188, 203-04 (2d Cir. 2006).

2. A "spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing" of the inert structures that were the Twin Towers had not occurred and, therefore, there had not been a "release" caused or permitted by any of the defendants. 42 U.S.C. §9601(22); Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 168 (2d Cir. 2002).

3. The materials that constituted the building structure and contents were not "solid waste or hazardous waste." 42 U.S.C. §9603(3).

---

[1] Defendants Silverstein Properties, Inc., World Trade Center Properties LLC, Silverstein WTC Management Co. LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 3 World Trade Center LLC, 4 World Trade Center LLC, and 7 World Trade Company, L.P. See Complaint ¶ 20-28.

[2] Defendants HMH WTC, Inc., Host Hotels and Resorts, Inc., Westfield WTC LLC, Westfield Corporation, Inc., and Consolidated Edison Company of New York, Inc. See Complaint ¶ 29-35.

[3] Defendants AMR Corporation and UAL Corporation. See Complaint ¶ 36-41.

Plaintiff appealed, and the Court of Appeals, without deciding the "thorny issues of statutory interpretation" of CERCLA that had to be applied to a "unique and unforeseen factual circumstance," remanded the case to me. Cedar & Washington v. Port Authority, 08 Civ. 9146, Doc. #103, 4 (S.D.N.Y., May 23, 2012). Its mandate, issued May 23, 2012, asked the district court to consider an additional "threshold question": "whether the attack on the World Trade Center on September 11 was an 'act of war' within the meaning of CERCLA's affirmative defense." Id. The Court of Appeals' mandate was for the limited purpose of allowing the district court to "decide in the first instance whether the act-of-war exception in CERCLA, considered in the context of CERCLA's statutory scheme and the intent of Congress, applies in this case." Id. at 5. Pending such decision, the court of appeals retained jurisdiction.

Pursuant to the mandate, the parties briefed the act-of-war exception to CERCLA, and I heard argument. I hold, for the reasons expressed in this opinion, that the act-of-war exception to CERCLA liability constitutes a defense to claims under that statute and provides another reason to dismiss plaintiff's CERCLA claims.

## I.    The Attacks of September 11, 2001, on the World Trade Center and the Pentagon

Soon after the attacks of September 11, 2001, Congress appointed a commission to study the attacks and investigate the circumstances which allowed them to occur. The commission's final report is the source of the information that follows. The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States (2004). Although the parties to this lawsuit have not disputed the information set out in the final report, I do not wish to give it an imprimatur of admissibility. See Fed. R Evid. 803(8). There are 9/11 cases still pending, and the parties to those lawsuits may wish, and should have the right, to

challenge that information. Nevertheless, for purpose of the motion before me, I adopt the facts set out in the report, as discussed below.

Al Qaeda is an extra-national terrorist organization founded by Osama Bin Laden, cleric Abdul Aziz, and other mujahedeen fighters to continue the "holy war" begun during the Soviet occupation of Afghanistan from 1979 to 1988. Al Qaeda built upon the financial, military, and political network Bin Laden established during the occupation. By mid-1988, Bin Laden was the clear leader of al Qaeda. An inner circle of Bin Laden's closest advisors formed the heart of the organization, while distinct committees handled matters of intelligence, military, finance, politics, and propaganda.

Bin Laden "singled out the United States for attack" as far back as 1992. The 9/11 Commission Report 48. In 1996 and 1998, he issued fatwas declaring holy war against the United States. Bin Laden obtained territory and support to organize and train soldiers for al Qaeda from the Taliban leadership of Afghanistan. Al Queda organized and initiated terrorist attacks in the Middle East and Africa in the 1990s, bombed the American embassies in Tanzania and Kenya in 1998, and attacked the USS Cole while it was anchored in Aden, Yemen, in October 2000. In August 1998, Bin Laden narrowly escaped a retaliatory missile strike by the United States on training camps in Afghanistan. Throughout, Bin Laden kept his focus on the "far enemy," planning an attack on the United States homeland. Id. at 59.

In late 1998 or early 1999, Khalid Sheik Mohammed joined Bin Laden in formulating a plan to infiltrate terrorists into the United States, have them train there to become pilots, and hijack aircraft they could fly into prominent buildings, with the goal of killing hundreds of people, embarrassing the United States, and paralyzing its leadership. Planning began in earnest in late 1999 with the preliminary selection of recruits to carry out the attacks. In

4

the spring and summer of 2000, the first wave of jihadists began to arrive in the United States. Once there, they took English language classes, melted into various communities, and attended flight schools. Then, Bin Laden and others began selecting and training "muscle hijackers" to storm cockpits and control passengers. This second wave of hijackers began arriving in the U.S. in the spring of 2001 and were assisted by the jihadists who had previously arrived. All the while, they lived and trained off a constant income stream from al Qaeda. All told, the planning and preparation of the attack cost al Qaeda between $400,000 and $500,000. Id. at 172. Nineteen men, trained to hijack and fly aircraft, were organized into four teams.

On the night of September 10, 2001, the terrorists selected for the attack checked into hotels close to their respective fields of operations: Portland, Maine; Boston, Massachusetts; Newark, New Jersey; and Herndon, Virginia. In the early morning of September 11, 2001, the terrorists began to carry out their coordinated plans. Two terrorists cleared security in Portland, Maine, for onward travel on American Airlines flight 11 from Logan airport in Boston to Los Angeles. Eight terrorists cleared security in the American and the United Terminals at Logan; three to travel on flight 11 with the two coming from Portland, and five to travel on United Airlines flight 175 to Los Angeles. A third team of five terrorists boarded American flight 77 at Dulles Airport, also destined for Los Angeles, and a fourth team of four boarded United flight 93 at Newark Airport, destined for San Francisco.

The planes, Boeing 757 and 767 super-jets, were heavily laden with fuel for their cross-country trips. Most of the terrorists flew first or business class to be closer to the cockpits, and carried box-cutters, utility knives, and Mace or pepper spray in their carry-on bags. Once the planes completed their ascents, the teams went into action. Using their weapons, the hijackers attacked the crews, stabbing flight attendants and resisting passengers, forcing open the cockpit

5

doors, and cutting the throats of the pilots, killing them. They used pepper spray and claimed to have bombs, to control the passengers and deter resistance.

American flight 11 took off at 7:59 a.m. from Logan Airport; United flight 175 took off from Logan fifteen minutes later, at 8:14 a.m.; and American flight 77 took off from Dulles Airport at 8:20 a.m. The hijacking of flight 11 began approximately fifteen minutes after takeoff, as the airplane neared its cruising altitude. Flights 77 and 175 were hijacked roughly 30 minutes after their respective takeoffs. The hijackers, upon capturing the planes, turned them towards their selected targets, descending rapidly and flying low to the ground and at high speeds. At 8:46 a.m., American flight 11 crashed into the North Tower of the World Trade Center. At 9:03 a.m., United flight 175 crashed into the South Tower. At 9:37 a.m., American flight 77 struck the Pentagon. Both World Trade Center towers became infernos and collapsed, the South Tower at 9:59 a.m., the North Tower at 10:28 a.m.

On United flight 93, matters did not progress the way the terrorists had planned. The four terrorists on board took longer than the other al Qaeda teams to organize the hijacking, waiting more than 45 minutes after the plane's 8:42 a.m. takeoff to begin their takeover. At that time, the flight was already over Ohio. The longer distance from the crash target in Washington, D.C. (probably the U.S. Capitol Building or the White House) meant a longer flight with the passengers under siege. Passengers contacted friends and family on their cell phones and learned of the other hijackings and the crashes into the World Trade Center and the Pentagon. At 9:57 a.m., 29 minutes after the hijacking began, the passengers launched a sustained counter-assault, killing one hijacker and causing the terrorist in the body of the airplane to flee into the cockpit, joining the two terrorists at the controls. The terrorist-pilots rolled and pitched the plane, but the counter-attacking passengers kept their footing. Using metal serving carts as battering rams, the

6

passengers forced entry into the cockpit, and sought to wrest the controls from the terrorist-pilots, but too late. One of the terrorists, invoking Allah, put the giant airplane into a dive, crashing it into an empty field in Shanksville, PA, scattering debris, killing all aboard, and disintegrating the airplane. The time was 10:02 a.m. The flight was approximately 20 minutes from Washington, D.C. The bravery of the passengers avoided further catastrophe.

Approximately 3,000 people were killed in the flights and in the stricken buildings. Approximately 2,600 of them were killed in the Twin Towers of the World Trade Center, and, of these, most were trapped above the crash points. In the North Tower, American flight 11 severed all emergency stairwells above the crash point, roughly at the 91st floor. In the South Tower, one stairwell above the crash point, approximately at the 81st floor, remained open, and occupants who were able to find that stairwell walked the flights of stairs to safety. Close to 200 of those trapped in the North Tower, in despair from the smoke and heat, jumped to their deaths. Some who jumped killed people on the ground. Others died of smoke inhalation. Still others were caught before being able to exit to the street by fire or suffocating smoke, by heat or exhaustion, or by the buildings' collapses. Hundreds of firemen and scores of policemen, climbing the stairwells in vain attempts to quench the fires, or organizing escapes down the crowded stairwells, died in place, in the line of duty. This country will never forget the bravery and selflessness of the men and women at the World Trade Center and the Pentagon who sought to help those in need, in the face of indescribable chaos and destruction.

By the afternoon of September 11, al Qaeda was considered the primary suspect in the attacks, and President George W. Bush told his advisors, "We're at war." On September 14, 2001, Congress passed the Authorization for Use of Military Force ("AUMF"), authorizing the President to use force against those who committed or aided in the terrorist attacks. The Bush

Administration began building a broad coalition of nations to strike back at al Qaeda and, if the Taliban government failed to eject al Qaeda, at Afghanistan as well. On September 20, 2001, at a joint session of Congress, President Bush issued an ultimatum to the Taliban, one that had already been conveyed privately: "They will hand over the terrorists, or they will share in their fate." In meetings on September 21 and October 2, 2001, President Bush approved military plans to attack Afghanistan. On October 7, 2001, CIA officers, Special Forces soldiers, and other Special Operations forces, working with coalition forces and Afghan factions opposed to the Taliban, initiated air strikes and ground raids. By early December, in two short months, all of Afghanistan's major cities were under coalition control. By March of 2002, Afghan forces, with U.S. assistance, had engaged al Qaeda forces in the country's mountainous regions, narrowly missed killing or capturing Bin Laden, and forced al Qaeda to flee to the frontier provinces of neighboring Pakistan.

The war continues to the present day. Khalid Sheikh Mohammed was captured on March 1, 2003, and is being tried by military commission at Guantanamo Bay. A daring surprise attack by U.S. Navy SEALs killed Bin Laden in his refuge in Pakistan on May 2, 2011. Al Queda leaders have been hunted and killed, one by one, by drone attacks from the air. A military force of approximately 66,000 U.S. and 37,000 allied soldiers are fighting the Taliban and al Queda in Afghanistan. More than 2,025 American soldiers have been killed and 18,000, wounded. President Barack Obama has pledged to bring most troops home by 2014, but the fight against al Queda continues in other countries in Asia and in Africa.

8

## II.    CERCLA

Congress passed CERCLA in 1980 to deal with "the serious environmental and

health risks posed by industrial pollution." Burlington Northern and Santa Fe Ry. Co. v. U.S.,

556 U.S. 599, 602 (2009); Pub. L. 96-510, Title I, Dec. 11, 1980, 94 Stat. 2767. CERCLA's

broad statutory purpose is to effect the cleanup of hazardous waste sites by holding those

responsible strictly liable. Spurred into action by the damaging effects of hazardous waste dump

sites in the late 1970s, including the Love Canal neighborhood in Niagara Falls, New York, and

the Valley of the Drums in Bullitt County, Kentucky, Congress sought "to promote the 'timely

cleanup of hazardous waste sites' and ensure that the costs of such cleanup efforts were borne by

those responsible for the contamination." William H. Rodgers, Jr., Environmental Law:

Hazardous Wastes & Substances, § 8.1, 471 (1992); Burlington Northern 556 U.S. at 602

(quoting United States v. Bestfoods, 524 U.S. 51, 55 (1998)).

### A.  The Scope of CERCLA Liability

CERCLA imposes strict liability on various individuals and entities for releases of

hazardous substances: current owners and operators of a waste site, past owners and operators,

those who arrange for disposal of a hazardous substance, and those who transported hazardous

waste to the site. The strict liability provision 42 U.S.C. § 9607(a) covers the following persons:

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or
> operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or
> treatment, or arranged with a transporter for transport for disposal or
> treatment, of hazardous substances owned or possessed by such person, by
> any other party or entity, at any facility or incineration vessel owned or
> operated by another party or entity and containing such hazardous substances,
> and
> (4) any person who accepts or accepted any hazardous substances for transport to
> disposal or treatment facilities, incineration vessels or sites selected by such

9

> person, from which there is a release, or a threatened release which causes the
> incurrence of response costs, of a hazardous substance...

42 U.S.C. § 9607(a). These individuals or entities are liable for "any...necessary costs of

response incurred by any...person" in cleaning up hazardous waste consistent with the national

contingency plan promulgated by the Environmental Protection Agency. 42 U.S.C. §§

9607(a)(4)(B), 9605; 40 C.F.R. Part 300. Liability under CERCLA is broad. As the Second

Circuit has described CERCLA's overall structure,

> CERCLA was designed, in part, to 'assur[e] that those responsible for any
> damage, environmental harm, or injury from chemical poisons bear the costs of
> their actions.' CERCLA, remedial in nature, is designed to encourage prompt and
> effective cleanup of hazardous waste sites....Somewhat like the common law of
> ultra-hazardous activities, property owners are strictly liable for the hazardous
> materials on their property, regardless of whether or not they deposited them
> there. Owners can escape liability only if the pollution results from an act of God
> or an act of war, or if the owners establish they are "innocent owners" under the
> statute.

Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 120 (2d

Cir. 2010) (internal citations omitted). This expansive, no-fault regime serves to ensure that

polluters pay for the cleanup of the sites they pollute. Rodgers 8.1, 472; see, General Electric Co.

v. Aamco Transmissions, Inc., 962 F.2d 281, 285 (2d Cir. 1992) ("It was Congress' intent that

CERCLA be construed liberally in order to accomplish these goals.").

## B. Defenses to CERCLA Liability

CERCLA provides three defenses to strict liability, but limits their application

severely. The defenses can come into play only if the party charged with polluting prove the

defense by a preponderance of the evidence. The alleged polluter must prove that the release of

the hazardous substance was "caused solely" by an "act of God," or by an "act of war," or by an

act of a third party. Only by such proof may the alleged polluter escape liability. Section 9607(b)

provides:

10

**Defenses.** There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by--

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b).

CERCLA defines an "act of God" as "an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 42 USCS § 9601(1). Courts have limited the "act of God" label to uncontrollable and unforeseen events. See United States v. M/V Santa Clara I, 887 F. Supp. 825, 843 (D.S.C. 1995) ("Even a poorly forecasted storm has been held under the Clean Water Act not to constitute an act of God because it was predicted and was avoidable."); United States v. Stringfellow, 661 F. Supp. 1053, 1061 (C.D. Cal. 1987) ("[T]he Court finds that the rains were not the kind of 'exceptional' natural phenomena to which the narrow act of God defense . . . applies. The rains were foreseeable…and any harm caused by the rain could have been prevented through design of proper drainage channels."). CERCLA also provides a long description of the "innocent owner" defense where pollution is caused by a third party. 42 U.S.C. § 9607(b)(3).

11

However, CERCLA provides no definition of an "act of war." Congress did not define the term in the text of CERCLA or in its legislative history. Does an "act of war" require a declaration of war by one nation-state against another? Can terrorist activities initiated by loosely-formed and organized groups, engaged in violence and operating in the interstices of nation-states, qualify as "acts of war"? Does the nature and extent of an attacked nation's response make a difference? The role of the act-of-war defense in CERCLA's overall statutory framework must also be considered. CERCLA is described as providing only limited defenses based on certain types of "unforeseeable intervening events." 4-14 Law of Hazardous Waste § 14.01[2][e]. An act of God and an act of war "appear to contemplate natural or man-made catastrophes beyond the control of any responsible party." Id. at § 14.01[8][b][ii]. Must an "act of war" be unforeseen? If the act was not "beyond the control of any responsible party," is it no longer an "act of war"? These are some of the questions to consider in interpreting CERCLA's act-of-war defense.

### C. Proposals to add Acts of Terrorism as a Defense

Congress was not aware of al Qaeda, or of the potential scope of an al Qaeda-like attack when it enacted CERCLA in 1980. Congress was aware of terrorist threats and terrorist attacks against individuals and groups, but not in any manner equivalent to acts of war against nations. Twice, however, Congress was asked to add acts of terrorism as a defense to strict liability under CERCLA, each time without success. For instance, the Oil Pollution Liability and Compensation Act of 1980, later introduced as an amendment to CERCLA, proposed to add a defense against liability for oil spills caused by "act[s] of war...or terrorism," but the proposal was not adopted. 126 Cong. Rec. S10846 (daily ed. Aug. 5, 1980) (statement of Sen. Gravel). When Congress amended CERCLA in 1986, a bill was proposed to broaden CERCLA's

12

defenses to include "an act of war, hostilities, civil war, insurrection, or a natural phenomenon of

an exceptional, inevitable, and irresistible character," H.R. 2817, 99th Cong. § 504 (1st Sess.

1985), but that proposal also was not enacted. Plaintiff argues that Congress' unwillingness to

add acts of terrorism as a defense confirms its argument that Defendants should not be allowed to

escape liability for clean-up expenses, but its argument may not extend to cases where acts of

terror are the equivalent of acts of war. That issue remains to be considered.

### D. CERCLA's Act-of-War Case Law

CERLCA's act-of-war defense has been raised infrequently, and without success.

In only one case was the defense discussed to any extent, United States v. Shell Oil Co., 294

F.3d 1045 (9th Cir. 2002). In that case, oil companies, engaged in the production of high-octane

aviation fuel during World War II, dumped acid waste byproducts at a site in Fullerton,

California. Aviation fuel was critical for the war effort, and the U.S. government actively

supervised its production. In the 1990s, the site was cleaned, and the federal government sued the

oil companies that had dumped the acid waste under CERCLA to recover the $100 million cost

of the clean-up. The companies alleged that the dumping occurred in response to an "act of war"

against the United States. The District Court rejected the defense, and the Court of Appeals

affirmed.

The Ninth Circuit Court of Appeals reasoned that industrial activities collateral to

the war effort were not themselves caused by "acts of war." The liability provisions of CERCLA,

the Court of Appeals noted, were written expansively, and the defenses, narrowly. As the Court

of Appeals stated:

> We agree with the district court that the 'act of war' defense is not available to the
> Oil Companies. Our analysis here recapitulates the district court's careful
> examination of the issue. The district court first noted that CERCLA uses
> expansive language to impose liability, but uses circumscribed and narrow

13

language to confer defenses. Compare, e.g., 42 U.S.C. § 9607(a) with id. § 9607(b). The district court then recognized that although the legislative history of CERCLA, and of its amendment in the Superfund Amendments and Reauthorization Act of 1986, did not explain the nature of the "act of war" defense, it did emphasize that CERCLA was to be a strict liability statute with narrowly construed exceptions.

Shell Oil, 294 F.3d at 1061 (internal citations omitted).

Reasoning further from international law treatises, the Court of Appeals

considered that since an "act of war" was traditionally given a "narrow meaning,"

generally involving "massive violence" from "catastrophes beyond the control of any

responsible party," the defense should not apply to the oil companies' waste production.

The Court of Appeals stated:

> The district court noted that the term "act of war" appears to have been borrowed from international law, where it is defined as a "use of force or other action by one state against another" which "the state acted against recognizes ... as an act of war, either by use of retaliatory force or a declaration of war." United States v. Shell Oil, 841 F. Supp. at 972 (citing James R. Fox, Dictionary of International and Comparative Law 6 (1992)). The two treatises that discuss the issue suggest that "act of war" has a narrow meaning. One suggests the "act of war" defense requires "massive violence." See 4 William H. Rodgers, Jr., Environmental Law: Hazardous Wastes and Substances § 8.13(C)(3)(c), at 697 (1992). The other suggests that it requires "natural or man-made catastrophes beyond the control of any responsible party." See 3 The Law of Hazardous Waste § 14.01[8][b], at 14-162 .2 (Susan M. Cooke, ed., 2001).

Shell Oil, 294 F.3d at 1061.

As a third reason, the Court of Appeals noted that the defenses to

CERCLA must be the "sole" cause of plaintiff's damages from the release of a pollutant.

Even if the government's involvement in wartime refining of aviation fuel could be

considered an "act of war," the Court of Appeals ruled that the defendant failed to prove

that the government's involvement was the sole cause of the pollution.

The case before me, unlike Shell Oil, does not involve the consequences of a response to an "act of war." Cedar & Washington alleges to have been damaged directly by the catastrophe itself—a catastrophe involving "massive violence," inflicted by an organization intending to attack, as Bin Laden characterized it, the "far enemy." As soon will be elaborated, the United States, the "state acted against," recognized the attack against it as an "act of war," and authorized the "use of retaliatory force" against those responsible. Id. at 1061.

## III.    Act of War: Traditional Definitions and Current Understandings

Traditionally, as the next several subsections discuss, an "act of war" is considered by treatises as an act of a state, distinguishable in insurance contracts and in certain remedial statutes from the acts of terrorists and pirates. But nothing found in the literature describes the extra-national organization of al Qaeda, the catastrophic devastation of lives and property of the 9/11 attacks, or the international armed conflict launched by the United States in response to the attacks.

### A. Traditional Definitions

Traditionally, an "act of war" was committed by uniformed military forces in the course of an armed conflict involving at least one nation-state. Black's Law Dictionary defines a "war" as a "[h]ostile conflict by means of armed forces, carried on between nations, states, or rulers, or sometimes between parties within the same nation or state." 8th ed. at 1614. A leading dictionary of international law defines an "act of war" as a "use of force or other action by one state against another [which t]he state acted against recognizes...as an act of war, either by use of retaliatory force or a declaration of war." James R. Fox, Dictionary of International and

15

Comparative Law, 3d ed. (2003). Another dictionary defines an "act of war" as "a measure of force which one party, using military instruments of power, implements against another party in an international armed conflict." The Handbook of Humanitarian Law in Armed Conflicts 49 (Dieter Fleck, ed., 1995). All definitions that I have found define the term in the context of acts by one state against another.

Prior to 9/11, that was the way the term was understood by the U.S. Supreme Court. During the Spanish-American war, U.S. forces seized a Spanish merchant vessel. A lawsuit by the vessel's owner for damages was dismissed; the seizure was held to be an "act of war, occurring within the limits of military operations" between Spain and the United States. Ribas y Hijo v. U.S., 194 U.S. 315, 323 (1904). During World War I, the U.S. government seized multiple patents owned by German companies pursuant to the Trading with the Enemy Act of 1918, 50 App. U.S.C.A. § 12. That seizure was held to be an "act of war." Farbwerke Vormals Meister Lucius & Bruning v. Chem. Found., 283 U.S. 152, 161 (1931). See also United States v. Winchester & Potomac R.R. Co., 163 U.S. 244, 256-58 (1896) (defining the seizure of Confederate railroad materials by Union forces during the Civil War as an "act of war"); New York Life Ins. Co. v. Bennion, 158 F.2d 260, 262 (10th Cir. 1946) (characterizing the 1941 Japanese attack on Pearl Harbor an "act of war"). In these cases, the "act of war" was perpetrated by a foreign state or by the United States against a foreign state or the Confederate South.

**B. Definitions in Insurance Contracts**

Insurance contracts typically distinguish between acts of terrorism and acts of war. The leading case in this circuit is Pan American World Airways, Inc. v. Aetna Casualty & Surety Co., 505 F.2d 989 (2d Cir. 1974), in which the court found the hijacking and later destruction of an airplane (after its passengers were evacuated) by the Popular Front for the

16

Liberation of Palestine not to be an act of war excluded from insurance coverage, but a criminal act of terrorists which the insurance contracts did not exclude. The Second Circuit Court of Appeals considered that "English and American cases" typically define a "war" as international law defines the term: as "hostilities carried on by entities that constitute governments at least de facto in character." Id. at 1012. "[W]ar is a course of hostility engaged in by entities that have at least significant attributes of sovereignty. Under international law war is waged by states or state-like entities." Id. Although, as the Court of Appeals observed, the "international law definition of war does not necessarily control the insurance meaning of the term," customary international law was central to the court's analysis. Id. n. 12. The Court of Appeals ultimately held,

> The loss of the Pan American 747 was not caused by any act that is recognized as a warlike act. The hijackers did not wear insignia. They did not openly carry arms. Their acts had criminal rather than military overtones. They were the agents of a radical political group, rather than a sovereign government.

Id. at 1015.

Insurance packages distinguish "acts of war" from "acts of terrorism" and "acts of piracy" in order to set clear parameters of reimbursable loss. A policy might exclude "acts of war" from coverage while insuring losses that incur as a result of piracy. See, e.g., Int'l Multifoods Corp. v. Commercial Union Ins. Co., 98 F. Supp. 2d 498 (S.D.N.Y. 2000), vacated in part, 309 F.3d 76 (2d Cir. 2002). A party seeking, for example, to insure ships or cargo passing through a war zone, might be able to pay a premium and delete the "act of war" exclusion. Losses incurred as a result of terrorism can be included in general all-risk insurance packages, and policyholders have the ability to buy separate terrorism insurance. U.S. Gov't Accountability Office, GAO-08-1057, Terrorism Insurance Availability (2008). The Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2002), which Congress passed in the

17

wake of the September 11 attacks and reauthorized in 2005 and 2007, generally requires that insurers offer terrorism insurance to commercial clients on the same terms as other types of insurance. See GAO-08-1057, Terrorism Insurance Availability. In most cases, the loss of cargo to a band of terrorists or pirates will be reimbursed if the insurance packages excludes from coverage only "acts of war." See e.g., Pan American, 505 F.2d; Wilker Bros. Co., Inc. v. Lumbermans Mut. Cas. Co., 529 F. Supp. 113, 116 (S.D.N.Y. 1981) (insurance package excluding from coverage "the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy").

Thus, the law and practice relating to insurance contracts distinguishes between acts of war and acts of terror in determining whether particular losses are, or are not, insured. But nothing in the cases approaches the catastrophe of 9/11, nor was the Popular Front for the Liberation of Palestine equal in organizational scope or destructive intent to al Qaeda, nor was the destruction of an airplane at an airport by that group the equivalent of the destruction of the World Trade Center and the damage to the Pentagon. Al Qaeda launched an attack on the most important commercial and political symbols of the United States—an attack that Congress and the President treated as an act of war against the United States. The events of September 11 were unique, and Congress, the President, and the American public treated 9/11 as unique.

## C. The Anti-Terrorism Act of 1992

The Anti-Terrorism Act ("ATA") of 1992 was enacted to provide a remedy in damages to U.S. nationals who suffer injury as a result of "an act of international terrorism." 18 U.S.C. §2333(a). However, it provides also that "[n]o action shall be maintained . . . for injury or loss by reason of an act of war." 18 U.S.C. § 2336(a). As the House Report described the intent of the legislation, the ATA distinguishes between "acts of war" and "acts of terrorism" in order

18

to provide recovery for injuries resulting from terrorist activities while barring recovery for injuries caused by military actions of recognized governments engaged in war or armed conflict. H.R. Rep. No. 102-1040 at 7 (1992); S. Rep. 102-342 at 46 (1992); see Stansell, 2011 WL 1296881 at *11 ("To find that a terrorist organization can be a military force under the ATA would defeat the purpose of the Act.").

Both terms—"act of war" and "act of international terrorism"—are defined by the statute. An "act of war" is defined to mean "any act occurring in the course of—(A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin." 18 U.S.C. § 2331(4). Acts of "terrorism" are defined to mean "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States" and that "appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1), (5).

Cases interpreting the ATA have maintained this distinction between "acts of war," from which the ATA provides no relief, and "acts of terrorism," which can be the basis of a federal lawsuit leading to a monetary recovery. In Gill v. Arab Bank, 2012 U.S. Dist. LEXIS 130107 (E.D.N.Y. Sept. 12, 2012), the plaintiff, an American and Israeli citizen, had been wounded by gunshots fired from Gaza into Israel by members of the Islamic Resistance Movement, known also as Hamas. He sued Arab Bank for recovery, alleging that the bank provided financial services to Hamas, its leaders, and its affiliates. The court denied a motion to dismiss the lawsuit, holding that the "act of war" defense did not apply. The "non-national armed

19

forces that primarily target civilians are not 'military' forces for purposes of the ATA," thus the shooting from Gaza was not an "act of war." Id. at *110.

In Morris v. Khadr, 415 F.Supp.2d 1323 (D.Utah 2006), a U.S. Army soldier, wounded in a surprise al Qaeda attack in Afghanistan, and the widow of a soldier killed in the same attack, sued members of al Qaeda who were involved in the attack. The court held that the soldier and widow were entitled to recover under the ATA because al Qaeda is not a "military force" and therefore the attack was not an "act of war." Applying the statute and its definitions, the court stated, "Al Qaeda is not a 'nation'; the people who fight in its behalf thus cannot be 'armed forces' or the 'military.' It is, instead, a 'group' that systematically uses violent and destructive acts in its attempts to coerce the United States into acceding to its demands." Id. at 1334. See also Stansell v. BGP, Inc., 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) (finding that the FARC in Colombia was not a "military force"); Weiss v. Arab Bank, PLC, 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007) (finding that Hamas, the Palestinian Islamic Jihad, and the Al Aqsa Martyrs Brigade, were not "military forces").

Estate of Klieman v. Palestinian Auth., 424 F. Supp. 2d 153, 166 (D.D.C. 2006), involved an American citizen, Esther Klieman, who was killed in a terrorist attack on a public bus traveling in Israel. Her estate sued the Palestinian Authority and various terrorist organizations for recovery under the ATA. The court held that the "act of war" defense did not apply. The ATA defines "acts of terrorism" and "acts of war" differently. "Acts of war" occur in the course of a declared war or armed conflict. Ms. Klieman, however, lost her life not in the course of a "declared war," an "armed conflict...between two or more nations," or an "armed conflict between military forces of any origin." 18 U.S.C. § 2331(4). "[A]n act that violates established norms of warfare and armed conflict under international law is not an act occurring

20

in the course of armed conflict." Id. at 166. Such an act is an "act of international terrorism" under the ATA. See also, Biton v. Palestinian Interim Self-Gov't Auth., 412 F. Supp. 2d 1 (D.D.C. 2005) (holding that an attack on a school bus in the Gaza Strip "did not occur 'in the course of' an armed conflict as a matter of law").

## IV. The U.S. Response to the Al Qaeda Attack of September 11, 2001

The terrorist attacks of September 11, 2001, were unique in our history. The terrorists who carried out the attacks were recruited, organized, trained, and financed by an extra-national terrorist organization, al Qaeda. Al Qaeda, although not a nation-state, operated in the interstices of nations, infiltrating and occupying large areas of Afghanistan and Pakistan, and operating also in Yemen, Somalia, and other countries of Asia and Africa. Al Qaeda's leadership declared war on the United States, and organized a sophisticated, coordinated, and well-financed set of attacks intended to bring down the leading commercial and political institutions of the United States, and cause havoc, devastation, and many deaths. Congress and the President responded by recognizing al Qaeda's attacks as an act of war and, pursuant to Congressional Resolution, sent our military forces, in coalition with the military forces of other nations, to wage war against those who perpetrated the attacks and the collaborating Taliban government. Two Presidents, several Congresses, and the U.S. Supreme Court have characterized the military and political response of the United States to the attacks of September 11 as a "war."

The September 11 attacks were not carried out by uniformed, "armed forces." But al Qaeda trained and disciplined its disciples to carry out attacks of great force, devastation, and loss of life, attacking our embassies in Kenya and Tanzania and the U.S.S. Cole in the Middle East prior to 9/11. Al Qaeda's tactics, if employed by a nation-state, undoubtedly would be

21

considered acts of war.[4] In the wake of the 9/11 attacks, the President and his advisors drew a

distinction between al Qaeda and the Taliban government, the de facto government of

Afghanistan which had long harbored al Qaeda.[5] A military plan was developed to attack the

Taliban if they rejected U.S. demands to surrender Bin Laden and his chief lieutenants, close

terrorist camps, and comply with UN Security Council resolutions. When the Taliban refused

these demands, the U.S. military and its coalition allies attacked al Qaeda and the Taliban. The

9/11 Commission Report 330-34, 337-38.

## A. The President and the Congress

President George W. Bush characterized the attacks of September 11, 2001, an

"act of war," and declared it as such in executive policies and orders. President Bush told his

principal advisers, in the afternoon of September 11, "We're at war." The 9/11 Commission

Report 326. Before a joint session of Congress ten days after the attacks, the President declared,

"On September 11th, enemies of freedom committed an act of war against our country."

President Barack Obama has repeated these sentiments. In 2010 he said, "We are at war. We are

at war against al Qaeda, a far-reaching network of violence and hatred that attacked us on 9/11,

that killed nearly 3,000 innocent people, and that is plotting to strike us again. And we will do

whatever it takes to defeat them." Press Release of Remarks by President Obama on

Strengthening Intelligence and Aviation Security, Jan. 7, 2010.

---

[4] See Benjamin J. Priester, Who is a "Terrorist"? Drawing the Line Between Criminal Defendants and Military Enemies, 2008 Utah L. Rev. 1255, 1305 ( "al Qaeda engages in armed conflict much like a state: it carries out acts of violence against states that would constitute acts of war if committed by agents of a state").

[5] International law attributes the acts of terrorist groups to state governments only when the state exerts "effective control" over terrorist activities. See Military and Paramilitary Activities (Nicar. v. U.S.), 1986 I.C.J. 14 (June 27), at ¶ 115, 109; United States Diplomatic and Consular Staff in Tehran (Iran vs. U.S.), 1980 I.C.J. 3; Prosecutor v. Tadic, Case IT-94-1-A (Judgment on Appeal) (Int'l Crim. Trib. For Former Yugoslavia Appeals Chamber July 15, 1999), paras. 137-38 (adopting an "overall control" standard). See also Derek Jinks, September 11 and the Laws of War, 28 Yale J. Int'l L. 1, 12 n.60 (2003); Mark A. Drumbl, Terrorist Crime, Taliban Guilt, and the Asymmetries in the International Legal Order, 81 N.C. L. Rev. 1, 38-44 (2002).

Congress responded to the attacks of September 11 by passing the Authorization for Use of Military Force ("AUMF") on September 14, 2001. This joint resolution authorized the "the President...to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." AUMF, S.J.Res.23, §2(a), Sept. 14, 2001. By passing the AUMF, Congress authorized the President, within the meaning of section 5(b) of the War Powers Resolution, to "exercise[]" his powers "as Commander-in-Chief to introduce United States Armed Forces into hostilities," and to engage in such hostilities for longer than sixty days. AUMF §2(b); 50 U.S.C. §§1541(c), 1544(b). President Bush signed the AUMF on September 18, 2001.

The AUMF did not state explicitly that it was a declaration of war pursuant to the War Powers Clause, U.S. Const. art. I, § 8. But the resolution authorized the President to use "all necessary and appropriate force" against al Qaeda and against the "nations, organizations, or persons" who aided al Qaeda, pursuant to his powers as Commander in Chief of the armed forces, U.S. Const. art. II, § 2. The nation went to war in Afghanistan because we considered the terrorist attacks on New York and Washington to be acts of war.

An act of terror and devastation that provokes the response of war, itself becomes an "act of war." See New York Life Ins. Co. v. Bennion, 158 F.2d 260, 262 (10th Cir. 1946) (characterizing the Pearl Harbor attack of December 7, 1941, as an "act of war" although Congress did not declare war until December 8, 1941). As we learned in the twentieth century, and as has been true throughout history, war can take on a formal structure of armies in contrasting uniforms confronting each other on battlefields, and war can persist for years, fought

by irregular, insurgent forces and capable of causing extraordinary damage. See generally, Max

Boot, Invisible Armies: An Epic History of Guerrilla Warfare from Ancient Times to the Present

(2013). The response by the United States, through its Executive and Congressional branches,

was a war to respond to an act of war launched by al Qaeda.

### B. The U.S. Supreme Court

During the fighting in Afghanistan, coalition forces captured and detained Yaser

Esam Hamdi, an American citizen classified as an "enemy combatant" by the U.S. government.

A petition for a writ of habeas corpus challenged the government's right to detain him without

access to counsel and without notice of the charges against him. The district court held that the

government had presented insufficient evidence to justify Hamdi's detention and ordered further

*in camera* review. The court of appeals reversed and ordered that the petition be dismissed. The

United States Supreme Court granted certiorari and held that U.S. citizens could be detained as

"enemy combatants" without a violation of their due process rights if they are given a

meaningful opportunity before a neutral decisionmaker to contest the basis of their detention.

Hamdi v. Rumsfeld, 542 U.S. 507, 533 (2004).

In arriving at its decision, the Supreme Court reasoned that the AUMF triggered

the President's war powers, including the power to detain individuals "who fought against the

United States…as part of the Taliban." Id. at 518. The Court wrote:

> There can be no doubt that individuals who fought against the United States in
> Afghanistan as part of the Taliban, an organization known to have supported the
> al Qaeda terrorist network responsible for [the September 11, 2001,] attacks, are
> individuals Congress sought to target in passing the AUMF.

Id. The Court ruled that detention of such individuals was "fundamental and accepted" as "an

exercise of the 'necessary and appropriate force'" Congress authorized the President to use:

> We conclude that detention of individuals falling into the limited category we are considering, for the duration for the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the "necessary and appropriate force" Congress has authorized the President to use.

Id. at 518; see also, id. at 521.

In 2006, the case of another detainee came before the U.S. Supreme Court. Salim Ahmed Hamdan, the chauffeur and bodyguard of Osama Bin Laden, was captured in Afghanistan in 2001, transferred to U.S. military custody, and brought to the U.S. naval base in Guantanamo Bay, Cuba. Hamdan, petitioning for a writ of habeas corpus, contested the constitutionality of his prosecution by military commission. The district court granted the writ, but the court of appeals reversed. The U.S. Supreme Court granted certiorari. Again, the government based its authority to capture, detain, and try Hamdan on the AUMF and the President's powers as Commander in Chief. The Supreme Court accepted that premise, stating,"[W]e assume that the AUMF activated the President's war powers, see Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion), that these powers include the authority to convene military commissions in appropriate circumstances," and that these powers may be invoked even without a "formal declaration of war." Hamdan v. Rumsfeld, 548 U.S. 557, 594 (2006). As the Court stated:

> [N]othing in our analysis turns on the admitted absence of either a formal declaration of war or a declaration of martial law. Our focus instead is on the September 11, 2001, attacks that the Government characterizes as the relevant 'act[s] of war,' and on the measure that authorized the President's deployment of military force—the AUMF....[W]e do not question the Government's position that the war commenced with the events of September 11, 2001...."

Hamdan, 548 U.S. at 600 n.31. However, the Supreme Court ruled that the military commission established by the President to try Hamdan violated the Uniform Code of Military Justice, 10 U.S.C. § 801 *et seq.*, and the four Geneva Conventions signed by the President in 1949 and

ratified by the Senate in 1955. 6 U.S.T. 3114; 6 U.S.T. 3217; 6 U.S.T. 3316; 6 U.S.T. 3516. The

Supreme Court reversed the court of appeals and remanded for further proceedings.

## V.    Whether All, or Some, of the Moving Defendants May Assert the Act-of-War Defense as the Sole Cause of the Release

As Hamdi and Hamdan held, al Qaeda's attacks on New York and Washington

were acts of war against the United States. I follow these holdings, not earlier writings in

treatises and judicial opinions that mention the importance of formal declarations of war between

recognized nation-states. But a characterization of the 9/11 attacks as an "act of war" is not the

end of analysis. There are additional questions: whether all, or just some, of the moving

defendants can invoke the defense and, if so, to what effect.

The act-of-war defense to CERCLA liability requires an alleged polluter to prove

by a preponderance of the evidence that the act of war was the *sole* cause of the "spilling,

leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching,

dumping or disposing," of the hazardous inert materials of the World Trade Center. 42 U.S.C. §§

9607(b), 9601(22). The burden of such proof has been characterized as a "formidable obstacle,"

Rodgers § 8.13(a), "allow[ing] escape from liability only where external events overwhelm and

swamp the contributions of the defendant." Id.

The defendants who owned, leased property at, or operated businesses in, the

World Trade Center qualify for this defense.[6] Plaintiff does not allege that the World Trade

Center itself, or the activities within the Twin Towers, imposed a pollution hazard to nearby

buildings. Were it not for the purposeful collision of the two hijacked jumbo jets into the Twin

Towers, there would be no CERCLA claim. Since the collisions constitute an "act of war" to

---

[6] The Port Authority, the Silverstein Defendants, and the Ground Defendants. See infra notes 1, 2, 3.

26

which Congress and the President responded—Congress by the AUMF and the President as Commander in Chief of the nation's armed forces—the owner and lessees of the structures, and the operators of businesses within the structures, are entitled to assert the act-of-war defense, and such defense is a complete defense to liability. On this ground, and those stated in my earlier order of September 21, 2010, the Port Authority, the Silverstein Defendants, and the Ground Defendants are dismissed.

As to the Aviation Defendants, however, the case is different. The Aviation Defendants are sued as "owners and operators" of American Airline Flight 11 and United Airline Flight 175 for the alleged "spilling, leaking,…emitting, emptying, discharging,…[or] escaping" of airplane parts and fuel onto Cedar & Washington's building. 42 U.S.C. §§ 9607(a), 9601(22). The Aviation Defendants are not sued as the "owner or operator" of the World Trade Center, or as a "person who…owned or operated any facility at which…hazardous substances were disposed of," or as a "person who…arranged for disposal or treatment…of hazardous substances," or as a "person who…accepted any hazardous substances for transport to disposal or treatment facilities." 42 U.S.C. § 9607(a). Since the Aviation Defendants fall into none of these categories, plaintiff has no case against them, and I so held by my order of September 21, 2010. The act-of-war defense is not material to the case against the Aviation Defendants, and there is no reason why it should be alleged. No case has held that an airplane crash can constitute a "release" under CERCLA. See Robinson v. U.S. Cold Storage, Inc., 2002 WL 187511 (D. Del. Feb. 5, 2002).

Plaintiff alleges that, by reason of the crashes of the American and United jumbo jets into the Twin Towers of the World Trade Center, the disintegrated parts of the airplanes and the fuel they carried became part of the dust that infiltrated plaintiff's building, and thus

27

constituted a "spilling, leaking…emitting, emptying, discharging,…[or] escaping" of hazardous waste. But if that is plaintiff's theory, the "spilling, leaking, etc." was into the Twin Towers, where it became mixed in some fractional way with all the pulverized dust from the remains of the two, collapsed, 110-story office towers, which infiltrated neighboring buildings, including plaintiff's building. However, even under that theory, plaintiff could not show that the Aviation Defendants were among the classes that could be sued under CERCLA. 42 U.S.C. § 9607(a). If, somehow, plaintiff could survive motions and approach trial, it is unlikely that plaintiff could overcome the hurdle of proximate cause, to link the crashes of the two Boeing 767 jets, to the collapse of the Twin Towers, to the "spilling, leaking, etc." of airplane parts and fuel mixed with the dust of the towers, and to the infiltration of plaintiff's building one block away.

However, pursuant to the mandate of the court of appeals, I assume that plaintiff could sustain a CERCLA claim against Aviation Defendants. In that case, the Aviation Defendants could assert an act-of-war defense. And since the hazardous material plaintiff cleaned, and for which plaintiff sues, arose from the hijacked airplanes' collisions with the World Trade Center, plaintiff's damages arise from an act of war. Thus, the Aviation Defendants can assert a complete defense against CERCLA liability, and plaintiff's claim against them would have to be dismissed.

The exposure of the Aviation Defendants arises, realistically, not from CERCLA, but from their alleged fault in allowing the terrorists to evade airport screening, and to board and hijack the United and American airplanes. That issue of fault will have to be adjudicated in a different case.[7] Nothing in this decision, discussing the act-of-war defense to CERCLA, bears upon that case, or any of the other 9/11 cases pending before me.

---

[7] See Cantor Fitzgerald & Co., et al. v. American Airlines, Inc., et al., 04 Civ. 7318 (trial set to begin January 6, 2014); See also 21 MC 101 (collecting approximately 850 pending cases); World Trade Center Properties, L.L.C., et

28

Pursuant to my order of September 21, 2010, amplified by the discussion in this opinion, plaintiff has no legally sufficient claim for relief against the Aviation Defendants. To the extent that a claim is stated, the Aviation Defendants may invoke the act-of-war defense to CERCLA liability, and are dismissed pursuant to this defense as well.

## VI.    Conclusion

Whether CERCLA provides a cause of action for the clean-up costs of World Trade Center dust is, as the court of appeals characterizes, a "thorny" issue. If that characterization is apt, the applicability of the act-of-war defense could be described as a thicket of thorns. My holding as to the act-of-war defense should be read narrowly, fitting the facts of this case only. It should not be a precedent for cognate laws of insurance, for terrorist acts forming the basis of claims for monetary damages, and other such claims, or even for claims by other 9/11 plaintiffs that remain pending.

I hold, for the reasons expressed in this decision, that the act-of-war defense is another ground of dismissal for the owner and lessees of the World Trade Center, the Ground Defendants, and the Aviation Defendants.

SO ORDERED.

Dated:     March 20, 2013
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

---

al. v. United Airlines, Inc., et al., 08 Civ. 3719; World Trade Center Properties LLC, et al. v. American Airlines, Inc., et al., 08 Civ. 3722.